# ALEXANDER, GOVERNOR OF TENNESSEE, ET AL. *v.* CHOATE ET AL.

No. 83–727.   Argued October 1, 1984—Decided January 9, 1985

MARSHALL, J., delivered the opinion for a unanimous Court.

*W. J. Michael Cody,* Attorney General of Tennessee, argued the cause for petitioners. With him on the briefs were *William M. Leech, Jr.,* former Attorney General, *William B. Hubbard,* Chief Deputy Attorney General, and *Frank J. Scanlon,* Deputy Attorney General.

*Deputy Solicitor General Bator* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Cooper, John H. Garvey,* and *Brian K. Landsberg.*

*Gordon Bonnyman* argued the cause for respondents. With him on the brief were *Brian Paddock, Arlene Mayerson, J. LeVonne Chambers,* and *Eric Schnapper.**

---

*Robert E. Williams* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Center for Independent Living—San Gabriel/Pomona Valleys et al. by *Marilyn Holle* and *Timothy Cook;* and for United Cerebral Palsy of New York City, Inc., by *Michael A. Rebell.*

JUSTICE MARSHALL delivered the opinion of the Court.

In 1980, Tennessee proposed reducing the number of annual days of inpatient hospital care covered by its state Medicaid program. The question presented is whether the effect upon the handicapped that this reduction will have is cognizable under § 504 of the Rehabilitation Act of 1973 or its implementing regulations. We hold that it is not.

I

Faced in 1980–1981 with projected state Medicaid[1] costs of $42 million more than the State's Medicaid budget of $388 million, the directors of the Tennessee Medicaid program decided to institute a variety of cost-saving measures. Among these changes was a reduction from 20 to 14 in the number of inpatient hospital days per fiscal year that Tennessee Medicaid would pay hospitals on behalf of a Medicaid recipient. Before the new measures took effect, respondents, Tennessee Medicaid recipients, brought a class action for declaratory and injunctive relief in which they alleged, *inter alia*, that the proposed 14-day limitation on inpatient coverage would have a discriminatory effect on the handicapped.[2] Statistical evidence, which petitioners do not

---

[1] Medicaid was established by Title XIX of the Social Security Act of 1965, 79 Stat. 343, as amended, 42 U. S. C. § 1396 *et seq.* Medicaid is a joint state-federal funding program for medical assistance in which the Federal Government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the State has agreed to assume. Once a State voluntarily chooses to participate in Medicaid, the State must comply with the requirements of Title XIX and applicable regulations. *Harris* v. *McRae*, 448 U. S. 297, 301 (1980).

[2] The State proposed an array of other changes in its Medicaid program. Although respondents challenged many of these other changes, settlement was reached on all the proposed changes other than the reduction in the number of inpatient days covered. Thus none of the other changes is before this Court. Respondents also asserted a number of causes of action

dispute, indicated that in the 1979–1980 fiscal year, 27.4% of all handicapped users of hospital services who received Medicaid required more than 14 days of care, while only 7.8% of nonhandicapped users required more than 14 days of inpatient care.

Based on this evidence, respondents asserted that the reduction would violate § 504 of the Rehabilitation Act of 1973, 87 Stat. 394, as amended, 29 U. S. C. § 794, and its implementing regulations. Section 504 provides:

> "No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U. S. C. § 794.

Respondents' position was twofold. First, they argued that the change from 20 to 14 days of coverage would have a disproportionate effect on the handicapped and hence was discriminatory.[3] The second, and major, thrust of respondents' attack was directed at the use of *any* annual limitation on the number of inpatient days covered, for respondents acknowledged that, given the special needs of the handicapped for medical care, any such limitation was likely to disadvantage the handicapped disproportionately. Respondents noted, however, that federal law does not require States to impose any annual durational limitation on inpatient cover-

---

other than their § 504 claim in their original and amended complaints. These additional legal theories are similarly not before the Court.

Since the District Court's decision, the State has amended its Medicaid program in two minor ways not materially significant to the issues presented on certiorari.

[3] The evidence indicated that, if 19 days of coverage were provided, 16.9% of the handicapped, as compared to 4.2% of the nonhandicapped, would not have their needs for inpatient care met.

age, and that the Medicaid programs of only 10 States impose such restrictions.[4] Respondents therefore suggested that Tennessee follow these other States and do away with any limitation on the number of annual inpatient days covered. Instead, argued respondents, the State could limit the number of days of hospital coverage on a per-stay basis, with the number of covered days to vary depending on the recipient's illness (for example, fixing the number of days covered for an appendectomy); the period to be covered for each illness could then be set at a level that would keep Tennessee's Medicaid program as a whole within its budget.[5] The State's refusal to adopt this plan was said to result in the imposition of gratuitous costs on the handicapped and thus to constitute discrimination under §504.

A divided panel of the Court of Appeals for the Sixth Circuit held that respondents had indeed established a prima facie case of a § 504 violation. *Jennings* v. *Alexander*, 715 F. 2d 1036 (1983). The majority apparently concluded that any action by a federal grantee that disparately affects the handicapped states a cause of action under § 504 and its implementing regulations. Because both the 14-day rule and any annual limitation on inpatient coverage disparately

---

[4] As of 1980 the average ceiling in those States was 37.6 days. Six States also limit the number of reimbursable days per admission, per spell of illness, or per benefit period. See App. B to Brief for United States as *Amicus Curiae*.

[5] See *Jennings* v. *Alexander*, 518 F. Supp. 877, 883, n. 7 (MD Tenn. 1981). Respondents' diagnosis-related reimbursement proposal is supported by a committee of the Tennessee Legislature, which has recommended that the State adopt such a plan. The Medicaid System of the Tennessee Department of Public Health, A Report of the Special Joint Committee to the Ninety-Third General Assembly 24, 26 (1983). The Court of Appeals seems to have mischaracterized this proposal of respondents as an attempt to limit "the total number of visits per annum rather than the number of days." *Jennings* v. *Alexander*, 715 F. 2d 1036, 1044 (CA6 1983).

affected the handicapped, the panel found that a prima facie case had been made out, and the case was remanded[6] to give Tennessee an opportunity for rebuttal. According to the panel majority, the State on remand could either demonstrate the unavailability of alternative plans that would achieve the State's legitimate cost-saving goals with a less disproportionate impact on the handicapped, or the State could offer "a substantial justification for the adoption of the plan with the greater discriminatory impact." *Id.*, at 1045. We granted certiorari to consider whether the type of impact at issue in this case is cognizable under § 504 or its implementing regulations, 465 U. S. 1021 (1984), and we now reverse.

## II

The first question the parties urge on the Court is whether proof of discriminatory animus is always required to establish a violation of § 504 and its implementing regulations, or whether federal law also reaches action by a recipient of federal funding that discriminates against the handicapped by effect rather than by design. The State of Tennessee argues that § 504 reaches only purposeful discrimination against the handicapped. As support for this position, the State relies heavily on our recent decision in *Guardians Assn.* v. *Civil Service Comm'n of New York City*, 463 U. S. 582 (1983).

In *Guardians*, we confronted the question whether Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d *et seq.*, which prohibits discrimination against racial and ethnic minorities in programs receiving federal aid, reaches both

---

[6] The District Court had dismissed respondents' complaint under Federal Rule of Civil Procedure 12(b)(6) on the basis, *inter alia*, that the effect on the handicapped of the plan that included the 14-day limitation was "not the type of discrimination that § 504 was intended to proscribe." 518 F. Supp., at 881.

intentional and disparate-impact discrimination.[7]   No opinion commanded a majority in *Guardians*, and Members of the Court offered widely varying interpretations of Title VI. Nonetheless, a two-pronged holding on the nature of the discrimination proscribed by Title VI emerged in that case. First, the Court held that Title VI itself directly reached only instances of intentional discrimination.[8]   Second, the Court held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI.[9]   In essence, then, we held that Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were readily

---

[7] Section 601 of the Civil Rights Act of 1964, 42 U. S. C. § 2000d, provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

The premise of the State's reliance on *Guardians* is that § 504 was modeled in part on Title VI, and that the evolution of Title VI regulatory and judicial law is therefore relevant to ascertaining the intended scope of § 504.   We agree with this basic premise.   See S. Rep. No. 93–1297, p. 39 (1974) ("Section 504 was patterned after and is almost identical to, the antidiscrimination language of section 601 of the Civil Rights Act of 1964, 42 U. S. C. 2000d–1 (relating to race, color, or national origin) and section 901 of the Education Amendments of 1972, 42 U. S. C. 1683 (relating to sex)").   Nonetheless, as we point out *infra*, at 295–297, and n. 13, too facile an assimilation of Title VI law to § 504 must be resisted.

[8] 463 U. S., at 607–608 (opinion of POWELL, J., in which BURGER, C. J., and REHNQUIST, J., joined); *id.*, at 612 (opinion of O'CONNOR, J.); *id.*, at 634 (opinion of STEVENS, J., in which BRENNAN and BLACKMUN, JJ., joined).

[9] *Id.*, at 584 (WHITE, J., announcing the judgment of the Court); *id.*, at 623, n. 15 (opinion of MARSHALL, J.); *id.*, at 634 (opinion of STEVENS, J., in which BRENNAN and BLACKMUN, JJ., joined).

enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts.

*Guardians*, therefore, does not support petitioners' blanket proposition that federal law proscribes only intentional discrimination against the handicapped. Indeed, to the extent our holding in *Guardians* is relevant to the interpretation of § 504, *Guardians* suggests that the regulations implementing § 504, upon which respondents in part rely, could make actionable the disparate impact challenged in this case.[10] Moreover, there are reasons to pause before too quickly extending even the first prong of *Guardians* to § 504. Cf. *Consolidated Rail Corporation* v. *Darrone*, 465 U. S. 624, 632–633, n. 13 (1984) (recognizing distinctions between Title VI and § 504).[11]

---

[10] See also *Lau* v. *Nichols*, 414 U. S. 563, 569 (1974) (Stewart, J., concurring). We conclude *infra*, at 304–306, and n. 24, that in this case the regulations do not in fact support respondents' action.

[11] In addition to the nature of the problems with which the § 504 Congress was concerned, see *infra*, at 295–297, at least two other considerations counsel hesitation before reading Title VI and § 504 *in pari materia* with respect to the effect/intent issue. First, for seven Justices, the outcome in the first prong of *Guardians* was settled by their view that a majority of the Court in *University of California Regents* v. *Bakke*, 438 U. S. 265 (1978), had already concluded that Title VI reached only intentional discrimination. See 463 U. S., at 607 (opinion of POWELL, J., in which BURGER, C. J., and REHNQUIST, J., joined); *id.*, at 612 (opinion of O'CONNOR, J.); *id.*, at 634 and 641, n. 12 (STEVENS, J., joined by BRENNAN and BLACKMUN, JJ., dissenting). Although two of the five Justices who were said to have reached such a conclusion in *Bakke* wrote in *Guardians* to reject this interpretation of *Bakke*, see 463 U. S., at 590–591 and 590, n. 11 (WHITE, J., announcing the judgment of the Court); *id.*, at 616–618 (MARSHALL, J., dissenting), in the view of the seven Justices *Bakke* controlled as a matter of *stare decisis*. Had these Justices not felt the force of this constraint, it is unclear whether they would have read an intent requirement into Title VI. See 463 U. S., at 626 (O'CONNOR, J., concurring in judgment) ("Were we construing Title VI without the benefit of any prior interpretation from this Court, one might well conclude that the statute was designed to redress more than purposeful discrimination") (citation omitted). For that reason, the conclusion that, in response to

Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.[12] Thus, Representative Vanik, introducing the predecessor to § 504 in the House,[13] described the treat-

---

factors peculiar to Title VI, *Bakke* locked in a certain construction of Title VI would not seem to have any obvious or direct applicability to § 504.

Second, by the time Congress enacted the Rehabilitation Act in 1973, nearly a decade of experience had been accumulated with the operation of the nondiscrimination provisions of Titles VI and VII. By this time, model Title VI enforcement regulations incorporating a disparate-impact standard had been drafted by a Presidential task force and the Justice Department, and every Cabinet Department and about 40 federal agencies had adopted standards in which Title VI was interpreted to bar prográms with a discriminatory impact. See *Guardians*, 463 U. S., at 629–630 (MARSHALL, J., dissenting). These regulations provoked some controversy in Congress, and in 1966 the House of Representatives rejected a proposed amendment that would have limited Title VI to only intentional discrimination. *Id.*, at 630–631. Thus, when Congress in 1973 adopted virtually the same language for § 504 that had been used in Title VI, Congress was well aware of the intent/impact issue and of the fact that similar language in Title VI consistently had been interpreted to reach disparate-impact discrimination. In refusing expressly to limit § 504 to intentional discrimination, Congress could be thought to have approved a disparate-impact standard for § 504. See *United States* v. *Rutherford*, 442 U. S. 544, 554 (1979); *Cannon* v. *University of Chicago*, 441 U. S. 677, 698–699 (1979).

[12] To be sure, well-cataloged instances of invidious discrimination against the handicapped do exist. See, *e. g.*, United States Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities, Ch. 2 (1983); Wegner, The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity Without Respect to Handicap Under Section 504 of the Rehabilitation Act of 1973, 69 Cornell L. Rev. 401, 403, n. 2 (1984).

[13] Although § 504 ultimately was passed as part of the Rehabilitation Act of 1973, the nondiscrimination principle later codified in § 504 was initially proposed as an amendment to Title VI. This proposal was first introduced by Representative Vanik in the House. See H. R. 14033, 92d Cong., 2d Sess., 118 Cong. Rec. 9712 (1972); H. R. 12154, 92d Cong., 1st Sess., 117 Cong. Rec. 45945 (1971). A companion measure was introduced in the Senate by Senators Humphrey and Percy. See S. 3044, 92d Cong., 2d Sess., 118 Cong. Rec. 525–526 (1972). The principle underlying these bills

ment of the handicapped as one of the country's "shameful oversights," which caused the handicapped to live among society "shunted aside, hidden, and ignored." 117 Cong. Rec. 45974 (1971). Similarly, Senator Humphrey, who introduced a companion measure in the Senate, asserted that "we can no longer tolerate the invisibility of the handicapped in America . . . ." 118 Cong. Rec. 525–526 (1972). And Senator Cranston, the Acting Chairman of the Subcommittee that drafted § 504,[14] described the Act as a response to "previous societal neglect." 119 Cong. Rec. 5880, 5883 (1973). See also 118 Cong. Rec. 526 (1972) (statement of cosponsor Sen. Percy) (describing the legislation leading to the 1973 Act as a national commitment to eliminate the "glaring neglect" of the handicapped).[15] Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.[16]

In addition, much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if

---

was reshaped in the next Congress and inserted as § 504 into major vocational-rehabilitation legislation then pending. Senator Humphrey and Representative Vanik indicated that the intent of the original bill had been carried forward into § 504. See 119 Cong. Rec. 6145 (1973) (statement of Sen. Humphrey); 118 Cong. Rec. 32310 (1972) (same); 119 Cong. Rec. 7114 (1973) (statement of Rep. Vanik). Given the lack of debate devoted to § 504 in either the House or Senate when the Rehabilitation Act was passed in 1973, see R. Cappalli, Federal Grants and Cooperative Agencies § 20:03 (1982), the intent with which Congressman Vanik and Senator Humphrey crafted the predecessor to § 504 is a primary signpost on the road toward interpreting the legislative history of § 504.

[14] 118 Cong. Rec. 30680 (1972) (statement of Sen. Randolph describing origins of § 504).

[15] Senator Percy was both a cosponsor of the predecessor to § 504 and of the Senate version of the Rehabilitation Act of 1973.

[16] See, e. g., United States Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities 17 (1983); Note, Accommodating the Handicapped: The Meaning of Discrimination Under Section 504 of the Rehabilitation Act, 55 N. Y. U. L. Rev. 881, 883 (1980).

not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent. For example, elimination of architectural barriers was one of the central aims of the Act, see, *e. g.*, S. Rep. No. 93–318, p. 4 (1973), yet such barriers were clearly not erected with the aim or intent of excluding the handicapped. Similarly, Senator Williams, the chairman of the Labor and Public Welfare Committee that reported out § 504, asserted that the handicapped were the victims of "[d]iscrimination in access to public transportation" and "[d]iscrimination because they do not have the simplest forms of special educational and rehabilitation services they need . . . ." 118 Cong. Rec. 3320 (1972). And Senator Humphrey, again in introducing the proposal that later became § 504, listed, among the instances of discrimination that the section would prohibit, the use of "transportation and architectual barriers," the "discriminatory effect of job qualification . . . procedures," and the denial of "special educational assistance" for handicapped children. *Id.*, at 525–526. These statements would ring hollow if the resulting legislation could not rectify the harms resulting from action that discriminated by effect as well as by design.[17]

---

[17] All the Courts of Appeals that have addressed the issue have agreed that, at least under some circumstances, § 504 reaches disparate-impact discrimination. See, *e. g.*, *New Mexico Assn. for Retarded Citizens* v. *New Mexico*, 678 F. 2d 847, 854 (CA10 1982); *Pushkin* v. *Regents of University of Colorado*, 658 F. 2d 1372, 1384–1385 (CA10 1981); *Dopico* v. *Goldschmidt*, 687 F. 2d 644, 652–653 (CA2 1982); *NAACP* v. *Wilmington Medical Center*, 657 F. 2d 1322, 1331 (CA3 1981) (en banc); *Majors* v. *Housing Authority of County of DeKalb, Georgia*, 652 F. 2d 454, 457–458 (CA5 1981); *Jones* v. *Illinois Dept. of Rehabilitation Services*, 689 F. 2d 724 (CA7 1982); *Stutts* v. *Freeman*, 694 F. 2d 666 (CA11 1983); *Georgia Assn. of Retarded Citizens* v. *McDaniel*, 716 F. 2d 1565, 1578–1580 (CA11 1983), vacated for further consideration in light of *Smith* v. *Robinson*, 468 U. S. 992 (1984), 468 U. S. 1213 (1984); cf. *Joyner by Lowry* v. *Dumpson*, 712 F. 2d 770, 775–776, and n. 7 (CA2 1983) (rejecting use of "adverse impact" theory as grounds for challenging state statute that requires parents who desire special state-subsidized residential child-care services

At the same time, the position urged by respondents—that we interpret § 504 to reach all action disparately affecting the handicapped—is also troubling. Because the handicapped typically are not similarly situated to the nonhandicapped, respondents' position would in essence require each recipient of federal funds first to evaluate the effect on the handicapped of every proposed action that might touch the interests of the handicapped, and then to consider alternatives for achieving the same objectives with less severe disadvantage to the handicapped. The formalization and policing of this process could lead to a wholly unwieldy administrative and adjudicative burden. See Note, Employment Discrimination Against the Handicapped and Section 504 of the Rehabilitation Act: An Essay on Legal Evasiveness, 97 Harv. L. Rev. 997, 1008 (1984) (describing problems with pure disparate-impact model in context of employment discrimination against the handicapped). Had Congress intended § 504 to be a National Environmental Policy Act[18] for the handicapped, requiring the preparation of "Handicapped Impact

---

for handicapped children to transfer temporary custody of their children to State, but reserving question of whether that test might be used in employment discrimination actions).

At least 24 federal agencies have reached the same conclusion. See 5 CFR § 900.704(b)(3) (OPM) (1984); 7 CFR § 15b.4(b)(4) (DOA) (1984); 10 CFR § 4.121(b)(4) (NRC) (1984); 10 CFR § 1040.63(b)(4) (DOE) (1984); 14 CFR § 251.103(b)(5) (NASA) (1984); 15 CFR § 8b.4(b)(4) (DOC) (1984); 18 CFR § 1307.4(b)(3) (TVA) (1984); 22 CFR § 142.4(b)(4) (DOS) (1984); 22 CFR § 217.4(b)(4) (AID/IDCA) (1984); 28 CFR §§ 41.51(b)(3), 42.503(b)(3) (DOJ) (1984); 29 CFR § 32.4(b)(4) (DOL) (1984); 31 CFR §§ 51.52(b)(1)(vi), 51.55(b)(1)(viii) (Dept. of Treas. (OST)) (1984); 32 CFR § 56.8(a)(6) (DOD) (1984); 34 CFR § 104.4(b)(4) (Dept. of Ed.) (1984); 38 CFR § 18.404(b)(4) (VA) (1984); 49 Fed. Reg. 1656 (EPA) (1984) (to be codified at 40 CFR pt. 7); 41 CFR § 101–8.303(d) (GSA) (1984); 43 CFR § 17.203(b)(4) (DOI) (1984); 45 CFR § 84.4(b)(4) (HHS) (1984); 45 CFR § 605.4(b)(4) (NSF) (1984); 45 CFR § 1151.17(c) (NEA) (1984); 45 CFR § 1170.12(c) (NEH) (1984); 45 CFR § 1232.4(b)(3) (ACTION) (1984); 49 CFR § 27.7(b)(4) (DOT) (1984). We are unaware of any case challenging the facial validity of these regulations.

[18] 42 U. S. C. § 4321 et seq.

Statements" before any action was taken by a grantee that affected the handicapped, we would expect some indication of that purpose in the statute or its legislative history. Yet there is nothing to suggest that such was Congress' purpose. Thus, just as there is reason to question whether Congress intended § 504 to reach only intentional discrimination, there is similarly reason to question whether Congress intended § 504 to embrace all claims of disparate-impact discrimination.

Any interpretation of § 504 must therefore be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds. Given the legitimacy of both of these goals and the tension between them, we decline the parties' invitation to decide today that one of these goals so overshadows the other as to eclipse it. While we reject the boundless notion that all disparate-impact showings constitute prima facie cases under § 504, we assume without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped. On that assumption, we must then determine whether the disparate effect of which respondents complain is the sort of disparate impact that federal law might recognize.

## III

To determine which disparate impacts § 504 might make actionable, the proper starting point is *Southeastern Community College* v. *Davis*, 442 U. S. 397 (1979), our major previous attempt to define the scope of § 504.[19] *Davis* involved a plaintiff with a major hearing disability who sought admission

---

[19]*Davis* addressed that portion of § 504 which requires that a handicapped individual be "otherwise qualified" before the nondiscrimination principle of § 504 becomes relevant. However, the question of who is "otherwise qualified" and what actions constitute "discrimination" under the section would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of the handicapped.

to a college to be trained as a registered nurse, but who would not be capable of safely performing as a registered nurse even with full-time personal supervision. We stated that, under some circumstances, a "refusal to modify an existing program might become unreasonable and discriminatory. Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped [is] an important responsibility of HEW." *Id.*, at 413. We held that the college was not required to admit Davis because it appeared unlikely that she could benefit from any modifications that the relevant HEW regulations required, *id.*, at 409, and because the further modifications Davis sought—full-time, personal supervision whenever she attended patients and elimination of all clinical courses—would have compromised the essential nature of the college's nursing program, *id.*, at 413–414. Such a "fundamental alteration in the nature of a program" was far more than the reasonable modifications the statute or regulations required. *Id.*, at 410. *Davis* thus struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones. Compare *ibid.* with *id.*, at 412–413.[20]

---

[20] In *Davis*, we stated that § 504 does not impose an "affirmative-action obligation on all recipients of federal funds." 442 U. S., at 411. Our use of the term "affirmative action" in this context has been severely criticized for failing to appreciate the difference between affirmative action and reasonable accommodation; the former is said to refer to a remedial policy for the victims of past discrimination, while the latter relates to the elimination of existing obstacles against the handicapped. See Note, Accommodating the Handicapped: The Meaning of Discrimination Under Section 504 of the Rehabilitation Act, 55 N. Y. U. L. Rev. 881, 885–886 (1980); Note, Accommodating the Handicapped: Rehabilitating Section 504

The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.[21]  In this

---

After *Southeastern,* 80 Colum. L. Rev. 171, 185–186 (1980); see also *Dopico* v. *Goldschmidt,* 687 F. 2d 644, 652 (CA2 1982) ("Use of the phrase 'affirmative action' in this context is unfortunate, making it difficult to talk about any kind of affirmative efforts without importing the special legal and social connotations of that term."). Regardless of the aptness of our choice of words in *Davis,* it is clear from the context of *Davis* that the term "affirmative action" referred to those "changes," "adjustments," or "modifications" to existing programs that would be "substantial," 442 U. S., at 410, 411, n. 10, 413, or that would constitute "fundamental alteration[s] in the nature of a program . . . ," *id.,* at 410, rather than to those changes that would be reasonable accommodations.

[21] As the Government states: "Antidiscrimination legislation can obviously be emptied of meaning if every discriminatory policy is 'collapsed' into one's definition of what is the relevant benefit." Brief for United States as *Amicus Curiae* 29, n. 36. At oral argument, the Government also acknowledged that "special measures for the handicapped, as the *Lau* case shows, may sometimes be necessary . . . ." Tr. of Oral Arg. 14–15 (referring to *Lau* v. *Nichols,* 414 U. S. 563 (1974)).

The regulations implementing § 504 are consistent with the view that reasonable adjustments in the nature of the benefit offered must at times be made to assure meaningful access. See, *e. g.,* 45 CFR § 84.12(a)(1984) (requiring an employer to make "reasonable accommodation to the known physical or mental limitations" of a handicapped individual); 45 CFR § 84.22 and § 84.23(1984) (requiring that new buildings be readily accessible, building alterations be accessible "to the maximum extent feasible," and existing facilities eventually be operated so that a program or activity inside is, "when viewed in its entirety," readily accessible); 45 CFR § 84.44(a)(1984) (requiring certain modifications to the regular academic programs of secondary education institutions, such as changes in the length of time permitted for the completion of degree requirements, substitution of specific courses required for the completion of degree requirements, and adaptation of the manner in which specific courses are conducted).

case, respondents argue that the 14-day rule, or any annual durational limitation, denies meaningful access to Medicaid services in Tennessee. We examine each of these arguments in turn.

A

The 14-day limitation will not deny respondents meaningful access to Tennessee Medicaid services or exclude them from those services. The new limitation does not invoke criteria that have a particular exclusionary effect on the handicapped; the reduction, neutral on its face, does not distinguish between those whose coverage will be reduced and those whose coverage will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having. Moreover, it cannot be argued that "meaningful access" to state Medicaid services will be denied by the 14-day limitation on inpatient coverage; nothing in the record suggests that the handicapped in Tennessee will be unable to benefit meaningfully from the coverage they will receive under the 14-day rule.[22] The reduction in inpatient coverage will leave both handicapped and nonhandicapped Medicaid users with identical and effective hospital services fully available for their use, with both classes of users subject to the same durational limitation. The 14-day limitation, therefore, does not exclude the handicapped from or deny them the benefits of the 14 days of care the State has chosen to provide. Cf. *Jefferson* v. *Hackney*, 406 U. S. 535 (1972).

To the extent respondents further suggest that their greater need for prolonged inpatient care means that, to provide meaningful access to Medicaid services, Tennessee must single out the handicapped for *more* than 14 days of

---

[22] The record does not contain any suggestion that the illnesses uniquely associated with the handicapped or occurring with greater frequency among them cannot be effectively treated, at least in part, with fewer than 14 days' coverage. In addition, the durational limitation does not apply to only particular handicapped conditions and takes effect regardless of the particular cause of hospitalization.

coverage, the suggestion is simply unsound. At base, such a suggestion must rest on the notion that the benefit provided through state Medicaid programs is the amorphous objective of "adequate health care." But Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs. Instead, the benefit provided through Medicaid is a particular package of health care services, such as 14 days of inpatient coverage. That package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered—not "adequate health care."

The federal Medicaid Act makes this point clear. The Act gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in "the best interests of the recipients." 42 U. S. C. § 1396a(a)(19). The District Court found that the 14-day limitation would fully serve 95% of even handicapped individuals eligible for Tennessee Medicaid, and both lower courts concluded that Tennessee's proposed Medicaid plan would meet the "best interests" standard. That unchallenged conclusion[23] indicates that Tennessee is free, as a matter of the Medicaid Act, to choose to define the benefit it will be providing as 14 days of inpatient coverage.

Section 504 does not require the State to alter this definition of the benefit being offered simply to meet the reality that the handicapped have greater medical needs. To conclude otherwise would be to find that the Rehabilitation Act requires States to view certain illnesses, i. e., those

---

[23] Because that conclusion is unchallenged, we express no opinion on whether annual limits on hospital care are in fact consistent with the Medicaid Act. See, e. g., Charleston Memorial Hospital v. Conrad, 693 F. 2d 324, 329–330 (CA4 1982) (upholding 12-day-a-year limitation on inpatient hospital coverage); Virginia Hospital Assn. v. Kenley, 427 F. Supp. 781 (ED Va. 1977) (upholding 21-day limitation).

particularly affecting the handicapped, as more important than others and more worthy of cure through government subsidization. Nothing in the legislative history of the Act supports such a conclusion. Cf. *Doe* v. *Colautti*, 592 F. 2d 704 (CA3 1979) (State may limit covered-private-inpatient-pyschiatric care to 60 days even though State sets no limit on duration of coverage for physical illnesses). Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance. *Southeastern Community College* v. *Davis*, 442 U. S. 397 (1979). The Act does not, however, guarantee the handicapped equal results from the provision of state Medicaid, even assuming some measure of equality of health could be constructed. *Ibid.*

Regulations promulgated by the Department of Health and Human Services (HHS) pursuant to the Act further support this conclusion.[24] These regulations state that recipients of federal funds who provide health services cannot "provide a qualified handicapped person with benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others." 45 CFR § 84.52(a)(3)(1984). The regulations also prohibit a recipient of federal funding from adopting "criteria or methods of administration that

---

[24] We have previously recognized these regulations as an important source of guidance on the meaning of § 504. See *Consolidated Rail Corporation* v. *Darrone*, 465 U. S. 624 (1984) (holding that 1978 Amendments to the Act were intended to codify the regulations enforcing § 504); *Southeastern Community College* v. *Davis*, 442 U. S., at 413 ("Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped person continues to be an important responsibility of HEW"); see generally *Guardians Assn.* v. *Civil Service Comm'n of New York City*, 463 U. S. 582 (1983). 1974 Amendments to the Act clarified the scope of § 504 by making clear that those charged with administering the Act had substantial leeway to explore areas in which discrimination against the handicapped posed particularly significant problems and to devise regulations to prohibit such discrimination. See, *e. g.*, S. Rep. No. 93–1297, pp. 40–41, 56 (1974).

have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to the handicapped." 45 CFR § 84.4(b)(4)(ii)(1984).[25]

While these regulations, read in isolation, could be taken to suggest that a state Medicaid program must make the handicapped as healthy as the nonhandicapped, other regulations reveal that HHS does not contemplate imposing such a requirement. Title 45 CFR § 84.4(b)(2)(1984), referred to in the regulations quoted above, makes clear that

> "[f]or purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement . . . ."

This regulation, while indicating that adjustments to existing programs are contemplated,[26] also makes clear that

---

[25] Respondents also rely on a variety of other regulations. See, e. g., 45 CFR § 84.52(a)(2)(1984) (stating that a recipient who provides health services cannot "[a]fford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons"); § 84.4(b)(1)(iii) (prohibiting a recipient of federal funds from providing "a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others"); § 84.4(b)(1)(ii) (stating that a recipient cannot "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others").

[26] The interpretive analysis accompanying these regulations states:

"[T]he term 'equally effective,' defined in paragraph (b)(2), is intended to encompass the concept of equivalent, as opposed to identical, services and to acknowledge the fact that in order to meet the individual needs of handicapped persons to the same extent that the corresponding needs of nonhandicapped persons are met, adjustments to regular programs or the provision of different programs may sometimes be necessary." 45 CFR, pt. 84, App. A, ¶ 6 (1984).

Tennessee is not required to assure that its handicapped Medicaid users will be as healthy as its nonhandicapped users. Thus, to the extent respondents are seeking a distinct durational limitation for the handicapped, Tennessee is entitled to respond by asserting that the relevant benefit is 14 days of coverage. Because the handicapped have meaningful and equal access to that benefit, Tennessee is not obligated to reinstate its 20-day rule or to provide the handicapped with more than 14 days of inpatient coverage.

## B

We turn next to respondents' alternative contention, a contention directed not at the 14-day rule itself but rather at Tennessee's Medicaid *plan* as a whole. Respondents argue that the inclusion of any annual durational limitation on inpatient coverage in a state Medicaid plan violates § 504. The thrust of this challenge is that all annual durational limitations discriminate against the handicapped because (1) the effect of such limitations falls most heavily on the handicapped and because (2) this harm could be avoided by the choice of other Medicaid plans that would meet the State's budgetary constraints without disproportionately disadvantaging the handicapped. Viewed in this light, Tennessee's current plan is said to inflict a gratuitous harm on the handicapped that denies them meaningful access to Medicaid services.

Whatever the merits of this conception of meaningful access, it is clear that § 504 does not require the changes respondents seek. In enacting the Rehabilitation Act and in subsequent amendments,[27] Congress did focus on several

---

[27] The year after the Rehabilitation Act was passed, Congress returned to it with important amendments that clarified the scope of § 504. See Pub. L. 93–516, 88 Stat. 1617. While these amendments and their history cannot substitute for a clear expression of legislative intent at the time of enactment, *Davis, supra,* at 411, n. 11, as virtually contemporaneous and more specific elaborations of the general norm that Congress had enacted into law the previous year, the amendments and their history do shed

substantive areas—employment,[28] education,[29] and the elimination of physical barriers to access[30]—in which it considered the societal and personal costs of refusals to provide meaningful access to the handicapped to be particularly high.[31] But nothing in the pre- or post-1973 legislative discussion of § 504 suggests that Congress desired to make major inroads on the States' longstanding discretion to choose the proper mix of amount, scope, and duration limitations on services covered by state Medicaid, see *Beal* v. *Doe*, 432 U. S. 438, 444 (1977). And, more generally, we have already stated, *supra*, at 298–299, that § 504 does not impose a general NEPA-like requirement on federal grantees.[32]

---

significant light on the intent with which § 504 was enacted. See, *e. g.*, *Andrus* v. *Shell Oil Co.*, 446 U. S. 657, 666–671 (1980); *Seatrain Shipbuilding Corp.* v. *Shell Oil Co.*, 444 U. S. 572, 596 (1980). Congress again amended Title V of the Rehabilitation Act in 1978, in the process incorporating the enforcement mechanisms available under Title VI of the Civil Rights Act of 1964. See Pub. L. 95–602, 92 Stat. 2982, § 505(a)(2), 29 U. S. C. § 794a. We have previously relied on the post-1973 legislative actions to interpret § 504. *Consolidated Rail Corporation* v. *Darrone*, 465 U. S., at 632–633.

[28] "The primary goal of the Act is to increase employment." *Consolidated Rail Corporation* v. *Darrone, supra*, at 633, n. 13. See also 29 U. S. C. § 701 (11) (1976 ed.).

[29] See, *e. g.*, 117 Cong. Rec. 45974 (1971) (statement of Rep. Vanik); 118 Cong. Rec. 525–526 (1972) (statement of Sen. Humphrey); 119 Cong. Rec. 5882–5883 (1973) (statement of Sen. Cranston); 118 Cong. Rec. 3320–3322 (1972) (statement of Sen. Williams).

[30] See, *e. g.*, 29 U. S. C. § 701 (11) (1976 ed.); S. Rep. No. 93–318, p. 4 (1973); S. Rep. No. 93–1297, p. 50 (1974).

[31] Rehabilitation training, of course, was also central to the purposes of the 1973 Act, and such training might involve issues concerning specific health care benefits. In this case, however, respondents have never asserted that the 14-day rule has any effect at all on rehabilitation programs.

[32] Assuming, *arguendo*, that agency regulations may impose such a requirement in specific areas to further the purposes of § 504, see *Guardians Assn.* v. *Civil Service Comm'n of New York City*, 463 U. S. 582 (1983); *Lau* v. *Nichols*, 414 U. S. 563 (1974), the current regulations are drafted in far too broad terms to permit the conclusion that state Medicaid programs must always choose, from among various otherwise legitimate benefit and

The costs of such a requirement would be far from minimal, and thus Tennessee's refusal to pursue this course does not, as respondents suggest, inflict a "gratuitous" harm on the handicapped.  On the contrary, to require that the sort of broad-based distributive decision at issue in this case always be made in the way most favorable, or least disadvantageous, to the handicapped, even when the same benefit is meaningfully and equally offered to them, would be to impose a virtually unworkable requirement on state Medicaid administrators.  Before taking any across-the-board action affecting Medicaid recipients, an analysis of the effect of the proposed change on the handicapped would have to be prepared.  Presumably, that analysis would have to be further broken down by class of handicap—the change at issue here, for example, might be significantly less harmful to the blind, who use inpatient services only minimally, than to other subclasses of handicapped Medicaid recipients; the State would then have to balance the harms and benefits to various groups to determine, on balance, the extent to which the action disparately impacts the handicapped.  In addition, respondents offer no reason that similar treatment would not have to be accorded other groups protected by statute or regulation from disparate-impact discrimination.

It should be obvious that administrative costs of implementing such a regime would be well beyond the accommodations that are required under *Davis*.  As a result, Tennessee need not redefine its Medicaid program to eliminate

---

service options, the particular option most favorable, or least disadvantageous, to the handicapped.  Before we would find that these generally worded regulations were intended to limit a State's longstanding discretion to set otherwise reasonable Medicaid coverage rules, that intent would have to be indicated with greater specificity in the regulations themselves or through other agency action.

The Government agrees that the current regulations are not intended to impose a NEPA-like requirement on state Medicaid administrators.

durational limitations on inpatient coverage, even if in doing so the State could achieve its immediate fiscal objectives in a way less harmful to the handicapped.

## IV

The 14-day rule challenged in this case is neutral on its face, is not alleged to rest on a discriminatory motive, and does not deny the handicapped access to or exclude them from the particular package of Medicaid services Tennessee has chosen to provide. The State has made the same benefit—14 days of coverage—equally accessible to both handicapped and nonhandicapped persons, and the State is not required to assure the handicapped "adequate health care" by providing them with more coverage than the nonhandicapped. In addition, the State is not obligated to modify its Medicaid program by abandoning reliance on annual durational limitations on inpatient coverage. Assuming, then, that § 504 or its implementing regulations reach some claims of disparate-impact discrimination, the effect of Tennessee's reduction in annual inpatient coverage is not among them. For that reason, the Court of Appeals erred in holding that respondents had established a prima facie violation of § 504. The judgment below is accordingly reversed.

*It is so ordered.*