946 F.2d 345
 57 Fair Empl.Prac.Cas. (BNA) 232,
57 Empl. Prac. Dec. P 41,027, 70 Ed. Law Rep. 371,
2 A.D. Cases 33, 2 NDLR P 120
 Sofia P. PANDAZIDES, Plaintiff-Appellant,
v.
VIRGINIA BOARD OF EDUCATION, Defendant-Appellee,
and
Educational Testing Service, Prince William County School
Board, Virginia Superintendent of Public
Instruction, Defendants,
Virginia School Boards Association, Amicus Curiae.
 No. 91-2313.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 11, 1991.
Decided Oct. 10, 1991.
As Amended Oct. 23, 1991.
 
 Michael D. Simpson, Washington, D.C., argued (Steven David Stone, Alexandria, Va., on brief), for plaintiff-appellant.
 Joan W. Murphy, Asst. Atty. Gen., Richmond, Va., argued (Mary Sue Terry, Atty. Gen., R. Claire Guthrie, Deputy Atty. Gen., Paul J. Forch, Sr. Asst. Atty. Gen., on brief), for defendant-appellee.
 Kathleen S. Mehfoud, Hazel & Thomas, P.C., Richmond, Va., on brief, for amicus curiae.
 Before ERVIN, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 This case involves a claim of handicap discrimination under § 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794; hereinafter § 504) by plaintiff Sofia Pandazides against the defendant Virginia Board of Education ("the Board"). The issue presented is whether the district court erred in granting summary judgment to the Board on Pandazides' claim of handicap discrimination and deciding that she was not "otherwise qualified" for the position of school teacher under § 504. Holding that the district court erred, we reverse.
 
 I.
 A.
 
 2
 Pandazides sued the Board alleging handicap discrimination under § 504 of the Rehabilitation Act of 1973. Pandazides was an applicant for professional teacher certification in Virginia. The Amended Complaint was filed on September 24, 1990. The Board moved for dismissal, or alternatively for summary judgment, on October 11, 1990. Summary Judgment was granted for the Board on October 30, 1990, 752 F.Supp. 696, from which this appeal was taken.B.
 
 
 3
 Pandazides is a teacher who suffers from several learning disabilities. Her employment as a teacher and her disability will be discussed in tandem. Pandazides graduated from Longwood College in May 1988 with a B.S. degree in special education. While her overall G.P.A. was 2.7, she made the Dean's list her last semester. During the course of college, she engaged in student teaching for a semester for which she was rated very highly.
 
 
 4
 In September 1988, Pandazides began teaching with the Prince William County, Virginia School District. She taught emotionally-disturbed children at Woodbridge Middle School for the next two years. During the 1988-89 academic year she taught pursuant to a one-year, non-renewable, probationary certificate, which permits teachers who have not yet passed the National Teachers Examination ("NTE") to teach for one year. In the course of that year, Pandazides was observed by evaluators. Moreover, she worked with an experienced teacher. The school, in its evaluation noted several areas in which Pandazides needed improvement. Despite the reviews, the school district reemployed her for the 1989-90 year pursuant to a "Temporary Teaching Agreement." During this year, she received an "E" rating on her Teacher Evaluation Report, the higher of two possible ratings. Nevertheless, since Pandazides has been unable to pass the Communication Skills portion of the NTE, she was deemed ineligible to teach by the Board.
 
 
 5
 The Commonwealth of Virginia requires that prospective teachers pass the NTE Core Battery and any appropriate Specialty Area test of the NTE. The core test at issue here is comprised of three components: General Knowledge, Professional Knowledge, and Communication Skills. Despite the general requirement that aspiring teachers pass the NTE, the Board does provide an exception. A policy promulgated in July 1988 expressly provides for a waiver of the NTE requirement for handicapped persons who can show that their handicap invalidates the test. Waivers must be requested through the Department of Education and are dependent on the severity of the handicap. According to a publication of the Board, "[i]f the severity of the handicap has been verified by appropriate authorities and is such that it invalidates the test, the individual will not be required to take that portion of the test. Moreover, Board policy empowers the Superintendent of Public Instruction to make "modifications" in the certification regulations in "exceptional and justifiable cases."
 
 
 6
 Between June 1987 and October 1988, Pandazides took and failed the Communications Skills[1] portion of the NTE six times. In January 1989, and by letter dated February 10, 1989, she requested that the Board exempt her from the requirement of having to pass that part of the NTE. On August 1, 1989, Pandazides wrote to the state Superintendent of Public Instruction requesting an exemption. Dr. Thomas A. Elliot, responding on behalf of the Superintendent, stated that notwithstanding Pandazides' documentation, the office was unable to grant an exemption. Meanwhile, Pandazides persuaded the Educational Testing Service ("ETS") to some extent to alter its testing procedure by providing her with a separate room, a script for the auditory portion of the test, a cassette player that played the tape at a slower pace, and 50 percent additional time. Taking the test under these conditions, Pandazides failed it twice. Pandazides' original and ongoing request is for ETS to allow her unlimited time to complete the test, to interact with the examiner, and to write out or talk about her answers.
 
 
 7
 The handicap that prevented Pandazides from passing the required NTE, of which the Skills test was one of three sections, was described by a clinical psychologist who specialized in the diagnosis and treatment of persons with learning disabilities. According to the doctor, she possessed the intelligence for teaching. Pandazides, nevertheless has three learning disabilities which meet the clinical standard for being considered handicapped. First, she suffers from "attentional defect disorder in the auditory modality," which limits her ability to input auditory information at the normal rate for a person of her age and intelligence. Second, Pandazides has "[d]ifficulty with the rapid integration of information from auditory and visual modalities," which adversely affects her ability to read quickly as would be the case on a standardized test. Third, she suffers from "dysnomia," which limits her ability to succinctly express a word or thought upon command. According to the psychologist Pandazides has developed "compensatory mechanisms to neutralize the impact of [her] disabilities" and has the ability to make herself understood by using examples and paraphrasing her thoughts. The psychologist opined:
 
 
 8
 It is my conclusion that Sofia Pandazides is a competent and qualified teacher. While her handicaps limit her ability to function in many areas of life that represent no problems for typical individuals of her chronological age and intelligence, they have no significant impact on her ability to teach. Ms. Pandazides' personality characteristics make her one of the more qualified and effective teachers that I have evaluated. [Her] command of the subject matter, ability to prepare in novel and creative ways to teach her students, her particular sensitivity to the unique and individual needs of special education students, do more, in my opinion, than minimally qualify her to teach. They provide her with very special skills that students are not likely to see in most teachers with whom they come into contact.
 
 II.
 
 9
 The grant of summary judgment to the Board was based on what we believe to be a misreading of Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Specifically, the trial court read the statutory term "otherwise qualified" to mean that Pandazides would have to meet all the licensure requirements. According to the trial court, her failure to meet those requirements through her inability to pass the Communication Skills section of the NTE meant she was not otherwise qualified; thus, she was not afforded the full protection of the statute. Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) and School Board of Nassau County, Florida v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), were decided subsequent to Davis to explicate its "otherwise qualified" definition, and necessitate reversal of the district court. The reasoning of the district court opinion and the dearth of factual findings indicate that summary judgment was improper.
 
 
 10
 The section of the Rehabilitative Act of 1973 (29 U.S.C. § 794) at issue prohibits recipients of federal assistance from discriminating against a person on the basis of his handicap. Section 504 states:
 
 
 11
 No otherwise qualified individual with handicaps ... shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 12
 The district court read the term "otherwise qualified" in light of Davis. The trial court held, in effect, that because Pandazides was unable to pass the test that she was not otherwise qualified. The holding, in light of the language of only the Davis case, is not altogether unreasonable.
 
 
 13
 In Davis, the Supreme Court decided whether or not Southeastern Community College violated § 504 by denying a deaf student admission to its nursing program. The Court held the college need not admit the deaf student and that "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." Id., 442 U.S. at 406, 99 S.Ct. at 2367. The term's denotative meaning, indicated in the blunt holding, seems to suggest that the court need only ask whether the plaintiff met the requirements to determine whether he was otherwise qualified. The factual context of the holding, however, suggests a more expansive connotative definition and a broader inquiry as well; both suggestions are made explicit in Arline and Alexander. Relying on the extensive factual findings of the district court, the Court examined the relationship between the requirement, the ability to hear, and the performance of the duties of a nurse. The Court noted that the respondent's handicap actually prevented her from safely performing in both the training program and her prospective profession. Id., at 403, 99 S.Ct. at 2365. Moreover, the Court noted that the inability to hear could pose a danger to future patients. Id. Finally, the Court noted that accommodations necessary to allow the deaf student to attend the college, a waiver of required courses in clinical training and individual supervision by faculty members, would represent "a fundamental alteration" in the college's program.
 
 
 14
 Throughout the Davis opinion the Court's concern about the attendant social and economic costs of admitting a student to a nursing program who was wholly unable to perform was evident. When the statutory definition is read against this factual backdrop, "otherwise qualified" may be understood more in terms of the job rather than an arbitrary set of requirements. Therefore, the trial court must do more than simply determine whether or not Pandazides meets all of the stipulated requirements of the Board, but look to what the position she seeks actually requires.
 
 
 15
 The necessary nexus between requirements and employment is described in Arline. The Supreme Court considered a claim similar to the instant case, namely that a plaintiff was denied employment as a teacher because of a handicap, a contagious disease. The Court stated that in determining whether someone is otherwise qualified for employment:
 
 
 16
 the District Court will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear....
 
 
 17
 480 U.S. at 287, 107 S.Ct. at 1130-31. Accordingly, defendants cannot merely mechanically invoke any set of requirements and pronounce the handicapped applicant or prospective employee not otherwise qualified. The district court must look behind the qualifications. To do otherwise reduces the term "otherwise qualified" and any arbitrary set of requirements to a tautology.
 
 
 18
 Arline indicates that this is particularly true in the employment context, as opposed to the education setting of Davis. Arline appears to draw a distinction between a more exclusive definition of otherwise qualified in education, and a more inclusive meaning in employment. The Court stated:
 
 
 19
 "An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." Southeastern Community College v. Davis, 442 U.S. 397 [99 S.Ct. 2361, 60 L.Ed.2d 980] (1979) (citations omitted) In the employment context, an otherwise qualified person is one who can perform "the essential functions" of the job in question. 45 C.F.R. § 84.3(K) (1985).
 
 
 20
 Thus, in the educational arena the facts of Davis regarding the prospective job after nursing training suggest a necessary relationship between requirements and the position. The definition of otherwise qualified, however, in the employment area explicitly mandates this relationship. As a consequence, a determination of whether Pandazides is otherwise qualified involves two factual determinations: first, whether she can perform the "essential functions" of a school teacher; and second, whether the requirements actually measure those functions. Even if the trial court were to determine that she could not perform her duties, it would also have to determine whether or not modifications could be made to allow Pandazides to teach. See, Davis, 442 U.S. at 408-409, 99 S.Ct. at 2368.
 
 
 21
 The holding of Alexander makes the necessity of the latter determination clear. In Alexander the Court held:Davis thus struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones.
 
 
 22
 The balance struck in Davis requires that an otherwise qualified individual must be provided with meaningful access to the benefit the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies the otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.
 
 
 23
 469 U.S. at 300, 105 S.Ct. at 719 (citations and footnotes omitted) (emphasis supplied). Alexander recognizes that a job may be defined, through a refusal to make reasonable accommodations, in a way that precludes the participation of the handicapped.
 
 
 24
 A review of the district court opinion reveals that in the wake of its conclusion that Pandazides was not otherwise qualified, no factual determinations were made as to whether the NTE requirements represented the essential functions of the job, whether she could perform the essential functions of the position, and whether a test waiver was a reasonable accommodation. Consequently, there are many material facts in dispute and unaddressed by the opinion. Therefore, the granting of summary judgment in this stage of the proceeding was improper.
 
 III.
 
 25
 For the reasons discussed above we reverse and remand for proceedings not inconsistent with this opinion.
 
 
 26
 REVERSED AND REMANDED.
 
 
 
 [1]
 Pandazides passed the other required portions of the NTE, including the General Knowledge and Professional Knowledge parts