801 F.Supp. 925 (1992)
Michael KING, by his guardian, Delores KING, Susan Roe, Mary Doe, Carolyn Romer, by her guardian, William Romer, individually, and on behalf of all others similarly situated; Parents and Friends for Alternate Living, Inc. ("PAL"); Autism Society of Rhode Island, Inc., Plaintiffs,
v.
Robert FALLON, Director of Rhode Island's Department of Human Services; Thomas Romeo, Director of Rhode Island's Department of Mental Health, Retardation and Hospitals; Robert L. Carl, Ph.D., Executive Director of the Division of Retardation and Developmental Disabilities, Department of Mental Health, Retardation and Hospitals, Defendants.
Civ. A. No. 89-0366L.
United States District Court, D. Rhode Island.
August 31, 1992.
*926 *927 Barry Best, R.I. Protection and Advocacy System, Providence, R.I., for plaintiffs.
Terrence Tierney, Atty. Gen.'s Dept., Providence, R.I., Robert J. Fallon, Ronald A. Lebel, Deborah Clarke, Dept. of Mental Health, Cranston, R.I., for defendants.

OPINION AND ORDER
LAGUEUX, District Judge.

I. INTRODUCTION
This case highlights the traumatic difficulty of providing medical and personal care to dependent, mentally retarded adults. When they are children, their problems are often mitigated by their youth, the energy of their parents, and an educational system that assumes much of the financial burden of caring for them. But as they enter adulthood, the educational subsidies end and their parents typically become unable to care for them. The government, on both the federal and state levels, becomes responsible for their care.
Rhode Island has pioneered the care of mentally retarded adults for many years. Compared to most other states, Rhode Island's programs are both innovative and generous. The annual resources devoted to Rhode Island's mentally retarded adults reached $95 million  20% of Rhode Island's Medicaid budget  for about 3,700 recipients in fiscal year 1991. Rhode Island now operates one large residential institution and three smaller group homes for the *928 mentally retarded,[1] and it places people in 105 privately operated facilities. The State is currently phasing out the Ladd Center, its large, public care facility and moving its population of dependant adults into a range of at-home, group-home, and small institutional programs.
The problem remains, however, that Rhode Island, despite its efforts, has fewer openings in these new programs than patients who want them. This case grows out of that shortage. The Plaintiff class consists of adult citizens of Rhode Island who seek placement in private intermediate care facilities for the mentally retarded ("ICF-MRs"), residential facilities that provide 24-hour care and supervision to persons who can benefit from active treatment. Defendants are the Rhode Island officials who are responsible for administering the State's Medicaid programs for the mentally retarded.
Much of the current dispute grows out of differing views on how the government should care for these people. From the perspective of many patients, Rhode Island is not doing enough to open up private ICF-MR bedspace for them. In the view of Rhode Island's Department of Human Services ("DHS"), however, placement in an ICF-MR is a restrictive and expensive option that the State should generally try to avoid. DHS seeks to move its patients away from ICF-MRs and into less restrictive programs whenever possible. In 1991, about 30 percent of the money Rhode Island spent on programs for the mentally retarded went to services delivered outside the confines of an ICF-MR. The State acknowledges that some patients require better services than it now provides, but the State also insists that it needs fewer, not more, ICF-MR beds.
These policy decisions are entrusted to DHS, not the federal judiciary. This Court is only concerned with Defendants' compliance with the Medicaid Act, 42 U.S.C. §§ 1396  1396u (1988 & Supp. II 1990). The questions in this case boil down to a single theme: How does federal law require Rhode Island to handle its shortage of space in private and small public ICF-MRs?
The answer lies in Rhode Island's Medicaid plan (the "State Plan"), which describes the medical services that the State agrees to provide in exchange for federal funds. The Federal Health Care Financing Agency ("HCFA") must approve the State Plan, and in this case HCFA has approved Rhode Island's State Plan. After receiving HCFA's approval, the State Plan cements the State's commitments under federal law. The State Plan sets forth the scope of service that the State is obligated to deliver. King v. Sullivan, 776 F.Supp. 645, 648, 651-53, 656 (D.R.I.1991). As this Court has already explained, if the State Plan does not offer a particular service or restricts Plaintiffs' access to it, then Rhode Island does not violate federal law by not providing it. Id. at 652.
The lawsuit reached a bench trial before the Court in June 1992. The details and substance of the Complaint are explained in this Court's earlier decision on Plaintiffs' motion for summary judgment,[2]King, 776 F.Supp. at 648-59.
Plaintiffs have alleged five general substantive violations and three general procedural violations of the federal Medicaid Act.[3] (I) Defendants allegedly do not promptly provide Medical Assistance services to all eligible individuals, in violation of 42 U.S.C. § 1396a(a)(8). (II) Defendants allegedly do not provide necessary medical services in the "amount, duration, or scope" required by the Medical Assistance program, in violation of 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. § 440.230(b). *929 (III) Defendants allegedly fail to make ICF-MR services equally available to all members of a Medical Assistance eligibility category, in violation of 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. § 440.240(b). (IV) Defendants allegedly do not make Medical Assistance payments that are sufficient to enlist new providers so that covered services are as available to Medicaid recipients as to the general population, in violation of 42 U.S.C. § 1396a(a)(30) and 42 C.F.R. § 447.204. (V) Defendants allegedly fail to give Plaintiffs freedom to choose their ICF-MR providers, in violation of 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 431.51(b). (VI) More than one State agency administers the State's Medical Assistance program, which Plaintiffs claim violates 42 U.S.C. § 1396a(a)(5) and 42 C.F.R. § 431.10. (VII) Defendants allegedly deny Plaintiffs an opportunity to obtain a timely ICF-MR level-of-care determination or referral to ICF-MR providers, in violation of 42 U.S.C. § 1396a(a)(8) and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. (VIII) When Defendants deny requests for ICF-MR placement or level-of-care determinations, they allegedly fail to provide notice of denial, reasons for denial, and notice of the availability of administrative review, in violation of 42 U.S.C. § 1396a(a)(3) and 42 C.F.R. § 431.206. In connection with all eight general claims, Plaintiffs also allege separate violations of their civil rights under 42 U.S.C. § 1983.
For the reasons that follow, the Court finds in favor of Defendants on claims I, II, III, IV, V, VI, VII, and the section 1983 civil rights claim. The Court finds in favor of Plaintiffs on claim VIII.

II. DISCUSSION

CLAIM I: ELIGIBILITY CRITERIA
Plaintiffs have failed to prove that Defendants do not promptly provide Medical Assistance services to eligible individuals or that Defendants apply eligibility criteria that are more stringent than federal law allows.

1. Legal Background

As this Court explained in its earlier decision, 42 U.S.C. § 1396a(a)(8) requires Plaintiffs to prove that eligible individuals are not receiving medical assistance under the State Plan. King, 776 F.Supp. at 650. The Medicaid Act does not require a more lenient ICF-MR admissions standard than that set forth in the State Plan. The State Plan must promise community residential services to Plaintiffs before the State's failure to provide such services can constitute a violation of federal law. Id.
Rhode Island has opted to include ICF-MR care in its State Plan since 1972. ICF-MR care is only one part of a wide range of Medicaid services available to Rhode Island's mentally retarded. ICF-MR placement is the most restrictive option, requiring residential commitment to a public or private institution. See 42 C.F.R. § 440.150(a)(1)(ii) (1991). Other options include community-based "waiver" and "rehabilitation" services. The waiver program assists patients while they live at home or independently, offering such services as nursing, personal care, adult foster care, daily habilitation, and respite services for patients or their families. See 42 U.S.C. § 1396n(c) (1988 & Supp. II 1990). Waiver services are generally non-institutional, but Rhode Island also has a number of "waiver homes," residential programs that offer fewer medical services than ICF-MRs. Waiver services are regulated and funded through a separate Medicaid program and are technically an exception to  a "waiver" from  the ICF-MR rule against payment for at-home care. Id.
To qualify for either ICF-MR or waiver services, a patient must be deemed "ICF-MR eligible." This is not a determination that the patient meets all criteria for placement in an ICF-MR. It is, instead, a minimum determination of financial and medical need for either waiver or ICF-MR services, a necessary, but insufficient, precondition for ICF-MR placement. See DHS Manual § 372, pp. 2-5. Whenever possible, Rhode Island seeks to treat the "ICF-MR eligible" with waiver services. Id. § 376, p. 1 (goals of waiver program are "to reduce *930 and prevent unnecessary institutionalization by providing home and community-based services to qualified mentally retarded MA recipients; and ... to provide the services in a cost-effective manner...."); DHS Social Service Manual (Plaintiffs' Exhibit 23), p. 411 ("All requests for placement into ICF/MR facilities from the community require careful scrutiny to ensure the best utilization of limited residential resources").
The "rehabilitation" option provides day-time clinical skills training. A person need not be "ICF-MR eligible" to receive rehabilitation services, which are not limited to the mentally retarded.

2. Findings of Fact

a. The State Plan
Based on the evidence presented at the trial, the Court makes the following findings of fact. The State Plan generally offers Medicaid to those whose financial situations qualify them as "categorically" or "medically" needy.[4] State Plan, p. 12. The State Plan offers the same ICF-MR services to members of both groups. Id.; Anthony Barile Testimony.
The Court is left partly in the dark, however, about the State Plan's further criteria for admission. The State Plan provides that, for categorically and medically needy applicants, "[t]he conditions of eligibility that must be met are specified in ATTACHMENT 2.6-A." State Plan, p. 12. Unfortunately, the sole copy of the State Plan presented to the Court, Plaintiffs' Exhibit 1, does not contain this crucial attachment.[5] Whether this omission was the result of oversight or strategy, Plaintiffs' failure to provide this crucial information seriously undermines their effort to prove their central allegation that Rhode Island's ICF-MR eligibility criteria are either too stringent or not followed.
From other State Plan excerpts admitted in evidence, the Court can determine that ICF-MR care is available "with limitations" to both categorically and medically needy persons. Id., Attachment 3.1-A, p. 7, para. 15; Attachment 3.1-B, p. 6, para. 15. One listed limitation on ICF-MR services is "prior authorization" for all admissions. Id. at Attachment 3.1-A, p. 7, para. 15 n. * & p. 11, para. 15b; Attachment 3.1-B, p. 6, para. 15 n. * & p. 15, para. 15b.
Although Plaintiffs' excerpts from the State Plan say no more about eligibility, Rhode Island's DHS Manual explains the limitations in greater detail. This document, which DHS officials use to determine whether to grant the "prior authorization" required under the State Plan, provides:
Subject to certain limitations and prior authorization requirements, Medical Assistance also provides payment for medically necessary care in Public Medical Facilities for Categorically and Medically Needy recipients. Public Medical Facilities are:
Center General Hospital (CGH)
Institute for Mental Health (IMH)
Ladd Center
Zambarano Memorial Hospital
Each type of facility provides a unique level of care. A Medical Assistance client requesting placement in a facility is individually evaluated to ensure that s/he is placed in a facility which offers the appropriate services.
DHS Manual § 362, p. 1 (emphasis added). The DHS Manual continues: "A patient qualifies for ICF/MR level of care if s/he is mentally retarded, and requires assistance with the Activities of Daily Living and/or supervision." Id. at p. 2.
The DHS Manual's emphasis on the uniqueness of each facility and the need for "appropriate services" for each patient according to the individual's medical needs underscores the unavoidable requirement that each ICF-MR have unique admissions criteria, a result of the myriad manifestations of mental retardation. For example, a four-bed group home for mildly retarded, partly independent adults would be wholly inappropriate for a severely retarded, *931 bedridden patient, and vise-versa. Each program must be tailored to meet each patient's individual needs, and a facility could even lose its certification if its patients are mismatched. David Nimmo Testimony; Raymond Arsenault Testimony. Plaintiffs have tended to ignore this reality. The variety of admissions criteria among Rhode Island's private and small public ICF-MRs is implicit in the "limitations" and the "prior authorization" requirement of the State Plan. State Plan, Attachment 3.1-A, p. 7, para. 15; Attachment 3.1-B, p. 6, para. 15; Attachment 3.1-A, p. 7, para. 15 n. * & p. 11, para. 15b; Attachment 3.1-B, p. 6, para. 15 n. * & p. 15, para. 15b.

b. The Plaintiffs
The circumstances of the named Plaintiffs are largely undisputed. Michael King has been placed in a private ICF-MR, so his claim is now moot. Carolyn Romer is 50 years old and had previously lived with her father, a recent widower, until she moved into a group home in April 1992. Before this move, she was offered home-based waiver services and placement in at least one other group home, which she rejected because of its distance from her father's home. Her claim is also now moot.
Susan Roe is 35 and autistic. She has poor memory, suffers from a heart condition, and lives with her mother, a 69 year old widow in extremely poor health. She has relatively advanced skills, showing a limited ability to read, swim, and skate. She is largely responsible for her own hygiene. In 1987, she requested placement in a group home for autistic adults, but she has not yet received placement. She has been deemed "ICF-MR eligible" and is receiving waiver services. Her mother has indicated that she would reject placement in the Ladd Center.
Mary Doe is now 27 years old. She is mildly retarded with limited independence but requiring continual medical and hygiene supervision. She once declared suicidal intentions and has demonstrated a propensity to solicit sexual attention from men, behavior that caseworkers attribute to suspected abuse from a brother and grandfather. She now lives at home with her mother and stepfather, both in their fifties. The brother suspected of abusing her is "in and out" of the same house, and caseworkers have witnessed her mother mistreating her physically. Mary Doe requested group home placement in 1989 but has not yet received an opening. She has also not yet received a level-of-care determination because, according to Defendants, she does not want waiver services and has been ambivalent about her desire for out-of-home placement. Nonetheless, Defendants consider her "ICF-MR eligible." Defendants' Memorandum of Supporting Law, p. 38.
The unnamed members of the Plaintiff class can only be classified generally. Between 1985 and 1991, 342 persons requested either immediate or future ICF-MR placement in Rhode Island. Of these, 222 have accepted placement in ICF-MRs or waiver homes, and 120 have not. Of those 120, 20 have withdrawn their requests. Of the 100 who still await Rhode Island placement, three are currently in out-of-state ICF-MRs, three have turned down offers of placement in particular ICF-MRs or waiver homes, one insists on placement in a specific group home, and one more is apparently ambivalent about his request. This leaves 92 persons who have requested ICF-MR placement in Rhode Island between 1985 and 1991 and who actively continue to wait for a first offer of placement. Add to this an estimated 12 unplaced applicants from 1992,[6] and the unserved Plaintiffs number around 104.
This figure of 104 can only be an estimate of those actively seeking immediate placement. Other patients who might qualify for ICF-MR placement but have not yet requested it, such as juveniles about to enter the adult system, will add to this number. See Plaintiffs' Exhibit 31. At the same time, the Plaintiffs did not distinguish between those seeking immediate and future placement, and so the number *932 of unserved applicants actively seeking immediate placement is probably lower than 104.

3. Analysis

The Court concludes, first, that Rhode Island's eligibility criteria for ICF-MR services do not violate federal law. Rhode Island's State Plan offers public ICF-MR care to the categorically and medically needy, subject to prior authorization and a determination that the particular placement is both medically necessary and appropriate. Under the Medicaid Act, Rhode Island is free to place these restrictions on its assistance. As the Court previously explained:
If a state includes ICF-MR services in its State Plan, as Rhode Island has done, then the state is free to set which level of ICF-MR care it will offer above the minimal requirements of 42 U.S.C. §§ 1396a(a)(10)(C)(iv). The state retains "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in `the best interests of the recipients.'" Alexander v. Choate, 469 U.S. 287, 303 [105 S.Ct. 712, 721, 83 L.Ed.2d 661] (1985) (quoting 42 U.S.C. § 1396a(a)(19)).
King, 776 F.Supp. at 651. There is no evidence that the State Plan does not meet the requirements of 42 U.S.C. §§ 1396a(a)(10)(C)(iv), which dictates that the State's ICF-MR program include certain medical, laboratory, and clinical services.
Second, Plaintiffs have not proved that Rhode Island's State Plan promises community residential services. As Defendants correctly point out, "Plaintiffs do not allege that there are [sic] a shortage of ICF/MR beds in the State. They allege that there is a shortage of small, privately operated, community-based group homes...." Defendants' Memorandum of Supporting Law, p. 16. But the State Plan only promises "medically necessary" care in four specific public ICF-MRs, and then only if the facility offers "appropriate" services for the applicant. If the State Plan promises more than this, Plaintiffs have failed to document it.
It is true that Rhode Island is currently striving to phase out its larger institutions. The Ladd Center, for example, was at one time scheduled to close in 1991. Delays in construction of alternative programs, however, have forced the Ladd Center to remain in operation to this day. The Ladd Center currently houses 153 patients and is scheduled to close in the summer of 1993. Despite these intentions, an offer of placement in the Ladd Center still conforms to the State Plan and, thus, the Medicaid Act. The Court will not infer from the State's documented intention to close the Ladd Center that the State will not meet its obligations in the future. The evidence suggests, instead, that the Ladd Center will remain open until it is no longer needed, probably after the 1993 deadline.
It is also true that Rhode Island's "appropriateness" limitation seems to depend, in part, on which ICF-MR openings are available at the moment. When an ICF-MR bed becomes available, DHS agents consider everyone who has requested placement, giving the opening to the most needy and appropriate person. This results in an ICF-MR wait list containing some patients who, at a different and more opportune time, might have found an appropriate placement. Much like organ transplant patients waiting for matching donors, these ICF-MR applicants face a shortage of appropriate services and must necessarily rely, to some degree, on good timing and luck. This is a natural characteristic of any shortage of goods under price regulation. But since the State Plan does not promise the commodity that is in short supply (placement in small, community-based ICF-MRs and group homes), 42 U.S.C. § 1396a(a)(8) neither prohibits the State from imposing ICF-MR admissions criteria that have this effect nor requires the State to eliminate the underlying shortage.
Implementing the State's bold plan to convert its entire ICF-MR program from large public institutions to smaller and more intimate settings, including homebased *933 treatment, will take years. Rhode Island is striving to exceed the standards of federal law and to deliver even more than it promises in its State Plan. DHS expects during the next few years to acquire about 280 new openings in various group homes, special care facilities, and community-supported living arrangements. Robert Carl Testimony. Plaintiffs are complaining, essentially, that these extra efforts are taking too long. Federal law gives them no support in this complaint.
Finally, Plaintiffs have failed to prove that persons who are eligible for the public ICF-MR care promised in the State Plan have been denied access to it. Plaintiffs could not prove this without evidence of the medical need of each unserved applicant and the "appropriateness" of the placements they have allegedly been denied.[7] Certainly all Plaintiffs are "ICF-MR eligible," but the State Plan does not promise ICF-MR placement to everyone in that class. Those who are deemed "ICF-MR eligible" are entitled to either public ICF-MR or waiver services, depending on their medical needs.
Plaintiffs have produced no evidence to contravene Defendants' assessments of the various Plaintiffs' medical needs. Plaintiffs' Exhibit 26 contains personal and medical information concerning every applicant for ICF-MR placement between 1985 and 1991, and many of these stories tell of great suffering and need. But no evidence gives the Court reason to question Defendants' way of allocating the State's limited resources to these people. In order to find Defendants in violation of the State Plan, the Court must have evidence of each applicant's unique medical needs and also a showing, such as by comparison to others who have been placed, that these needs qualify the applicant for ICF-MR placement under the State Plan. This evidence was never presented.
Defendants have contended throughout this litigation that all eligible Plaintiffs have been offered placement in the Ladd Center, which, if true, would satisfy the requirements of the State Plan. The Court has not seen proof either supporting or discounting this contention. Defendants, of course, do not have the burden of proving it; Plaintiffs must prove that Defendants do not provide what the State Plan minimally promises. Plaintiffs attempt to refute Defendants' claim by highlighting David Nimmo's testimony that DHS offers placement in the Ladd Center only a few times each year (and in making this argument, overlooking their own conflicting statement, at page 12 of their Pre-Trial Memorandum, that "hundreds" of eligible claimants have been offered Ladd Center placement). In any event, since the Court has no way of determining which of the Plaintiffs would be eligible for the Ladd Center, the number of annual placement offers proves nothing. Plaintiffs have not met their burden of proof. Accordingly, defendants are entitled to judgment in their favor on this claim.

CLAIM II: AMOUNT, DURATION, AND SCOPE
Plaintiffs have not proved that Defendants do not provide necessary medical services in the "amount, duration, and scope" required by the Medicaid Act.

1. Legal Background

The regulation upon which Plaintiffs base this claim, 42 C.F.R. § 440.230(b), requires that any medical assistance service provided be adequate to reasonably achieve the purposes of the medical assistance service offered in the State Plan. King, 776 F.Supp. at 652. A service is sufficient in "amount, duration, and scope" if it adequately meets the needs of most individuals who are eligible for Medicaid assistance to pay for that service. Id. at 652-53. The determinative question is: Does Rhode Island provide ICF-MR services that, for most eligible persons, reasonably meet the standards of ICF-MR care set forth in the State Plan? Id. at 653.

*934 2. Analysis and Findings of Fact

The Court finds that Rhode Island's programs meet this standard. The State Plan promises "medically necessary care in public ICF-MRs," subject to prior authorization requirements and a determination that the facility is appropriate for the applicant's needs. DHS Manual § 362, p. 1. Plaintiffs have failed to carry their burden of proving that most people for whom institutionalization in a small, community-based ICF-MR is medically necessary and appropriate have not been offered it. They have not shown that most persons for whom institutional ICF-MR care is "medically necessary" have not at least received offers of placement in a large, public ICF-MR. The evidence does indicate, however, that most people who are generally "ICF-MR eligible" now receive either ICF-MR care or waiver services. Indeed, the evidence shows that many applicants have turned down offers of placement in private group homes because they were not satisfied with some aspects of the programs.
Rhode Island's compliance with its State Plan is reasonable. This is all that federal law requires. King, 776 F.Supp. at 652. Accordingly, Defendants are entitled to judgment in their favor on this claim.

CLAIM III: EQUAL AVAILABILITY
Plaintiffs have not proved that Defendants do not make ICF-MR services equally available to all members of a Medical Assistance eligibility category. This is perhaps Plaintiffs' strongest substantive claim: without dispute, some mentally retarded adults receive private ICF-MR care while others receive none. But the categories of medical need are more specific than that. Plaintiffs failed to show that applicants with similar medical needs are treated disparately.

1. Legal Background

42 U.S.C. § 1396a(a)(10)(B) sets forth a requirement that the categorically needy receive at least the same level of protection as the medically needy, and that categorically needy individuals receive equal treatment vis-à-vis each other. Under Rhode Island's State Plan, the categorically and medically needy are entitled to the same services. State Plan, p. 12. Within the same sub-group of "medical need," states must distribute ICF-MR services equitably, so that benefit and hardship are shared. King, 776 F.Supp. at 653-54 (construing 42 C.F.R. § 440.240(b) (1990)). There is no similar requirement for waiver services.[8]
In this case, Plaintiffs must prove that persons with similar medical needs are treated disparately with regard to ICF-MR placement. Plaintiffs correctly highlighted this issue in their memoranda: "Central to plaintiffs' case is the argument that defendants cannot lawfully operate a system in which hundreds of recipients reside in [Medicaid]-funded, community group home ICF-MR programs, while hundreds of other equally eligible claimants are told that defendants will offer them only Ladd Center placement." Plaintiffs' Pre-Trial Memorandum, p. 12 (emphasis in original).

2. Analysis and Findings of Fact

The Court concludes, however, that Plaintiffs did not prove this alleged disparity of treatment. Plaintiffs have proved that about one hundred Medicaid recipients, despite their requests in various forms, have not been offered placement in ICF-MRs other than the Ladd Center. But the large number of unsatisfied applicants implies nothing about their individual medical needs and thus their eligibility for placement. Plaintiffs have failed to produce evidence to contravene Defendants' assessments of the various Plaintiffs' medical needs. The Court simply has no basis for comparing the haves to the have-nots.
Indeed, all of Plaintiffs' substantive claims suffer from a common, fatal defect. Aside from a suggestion in closing argument that the Court read some of the Plaintiffs' life stories, Plaintiffs have generally presented Rhode Island's ICF-MR applicants *935 as a pool of superficial statistics, downplaying the notion that each patient has unique problems and needs  a fact that the State Plan and Medicaid Act emphatically recognize. To prove a violation of the Act or State Plan, Plaintiffs must be very specific about each applicant's unique circumstances. Among the mentally retarded, the "medically needy" are not a monolithic group that one can lump together in a single bureaucratic classification. Their medical needs are manifested in many forms, shades, and degrees. These unique needs determine who may enter a particular ICF-MR and who may not. Plaintiffs never ventured into this level of detail. In contrast, the Court finds that Defendants are obviously intimately familiar with each Plaintiff's needs, and the DHS has shown reasonable judgment in its allocation of its limited private ICF-MR bedspace. Accordingly, Defendants are entitled to judgment in their favor on this claim.

CLAIM IV: ENLISTMENT OF NEW PROVIDERS
Plaintiffs gave no legally sufficient evidence showing that Defendants' Medical Assistance payments are insufficient to enlist new providers, in contravention of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204. This claim was essentially ignored at trial.
Plaintiffs argued in closing that the large number of "ICF-MR eligible" but yet unplaced applicants for ICF-MR care sufficiently supports this claim. The Court, however, has already made clear that the sufficiency of a state's reimbursement payments is measured solely by comparison to the rates that a health care facility can demand from non-Medicaid patients. King, 776 F.Supp. at 655. The Court has seen no evidence relating to that issue. Accordingly, Defendants are entitled to judgment in their favor on this claim.

CLAIM V: FREEDOM TO CHOOSE
Plaintiffs have not proved that Defendants fail to give them freedom to choose ICF-MR providers, an alleged violation of 42 U.S.C. § 1396a(a)(23).

1. Legal Background

As fully explained in the Court's earlier opinion, this statute imposes no obligation on a state to give recipients a menu of available ICF-MR services and providers from which to choose. King, 776 F.Supp. at 655. This subsection also does not apply to waiver services. If a qualified private ICF-MR agrees to provide services to a Medicaid recipient, then 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 431.51(b) prohibit the State from denying payment or requiring the recipient to use another provider. This is a negative command of noninterference. Plaintiffs ask the Court to compel Rhode Island to expand its State Plan so that ICF-MR vacancies always exist. Such a positive command is not found in the Medicaid statute.

2. Analysis and Findings of Fact

On its face, the State Plan meets the requirements of 42 U.S.C. § 1396a(a)(23). State Plan, p. 41. In practice, Defendants' procedure for matching applicants with particular ICF-MR providers also does not violate this so-called "freedom of choice" provision. As stated before, this subsection cannot prohibit the State from matching needy applicants with appropriate providers when doing so is the only feasible way to allocate these scarce services. King, 776 F.Supp. at 656.
Based on the evidence presented at trial, the Court finds that matching applicants to appropriate ICF-MRs and group homes is a necessary practice. Each patient has truly unique needs. Each of Rhode Island's small ICF-MRs can cater to only a narrowly-defined group of patients. Most ICF-MRs must choose their residents very carefully for social and medical compatibility. That each applicant for ICF-MR care does not find an immediate opening in an appropriate facility is simply a difficult, economic fact of life. So long as Defendants comply with the State Plan, the Court cannot, with the stroke of its pen, eliminate the shortage of private ICF-MR bedspace.
*936 The "freedom of choice" subsection of the Medicaid statute does not require Rhode Island to expand its ICF-MR services beyond those promised in the State Plan. Plaintiffs have neither proved nor even alleged that Defendants refuse to pay for services rendered by private ICF-MRs that have agreed to serve Plaintiffs. Accordingly, Defendants are entitled to judgment in their favor on this claim.

CLAIM VI: ADMINISTRATION BY MULTIPLE AGENCIES
Plaintiffs have offered no proof that several State agencies administer the State's Medical Assistance program in contravention of 42 U.S.C. § 1396a(a)(5). The Court noted earlier that this claim was based on a dubious interpretation of the Medicaid Act. King, 776 F.Supp. at 656-57. The relevant statute requires that a State Plan provide for a single state agency "to administer or to supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5) (1988). DHS, the single state agency responsible for overseeing Rhode Island's Medicaid plan, delegates certain authority to the Department of Mental Health, Retardation & Hospitals ("MHRH") and the Division of Retardation and Developmental Disabilities ("DORDD"). DHS sets the financial and medical admissions standards that the other agencies follow, and DHS has the final word on all placement decisions.
At summary judgment, the Court found no violation of federal law in Plaintiffs' allegation that DHS delegates this authority to MHRH and DORDD. King, 776 F.Supp. at 657. At trial, Plaintiffs conceded that the delegation is not in itself unlawful. Plaintiffs' Pre-Trial Memorandum, p. 23. Instead, Plaintiffs strapped this claim to their contention that MHRH and DORDD make improper level-of-care determinations and do not follow federal procedural requirements.
42 U.S.C. § 1396a(a)(5) only concerns the nature of the delegation, which Plaintiffs concede is not improper. Plaintiffs' complaints concerning how MHRH and DORDD exercise this delegated authority are already included in claims I, II, III, V, VII, and VIII. This claim states no separate cause of action. Accordingly, Defendants are entitled to judgment in their favor on this claim.

CLAIM VII: TIMELY REVIEW

1. Legal Background

Federal regulations require occasional re-evaluation of a recipient's Medicaid eligibility. A participating state must redetermine the eligibility of Medicaid recipients at least every 12 months. 42 C.F.R. § 435.916(a) (1991). DHS or another appropriate State agency must also make a prompt redetermination of a current recipient's level-of-care determination when the recipient brings to the agency's attention, in writing, a change in circumstances that could make him or her eligible for a different level of services. King, 776 F.Supp. at 657-58; 42 C.F.R. § 435.916(c) (1991). Federal regulations require the State to complete any such redetermination within 45 days of receiving the request and new information. 42 C.F.R. § 435.911(a)(2) (1991).

2. Findings of Fact

Plaintiffs have all applied for Medical assistance and all now receive or have been offered some form of Medicaid, primarily through the waiver option. Neither Plaintiffs nor Defendants presented evidence concerning how quickly these initial determinations were made.
Of the estimated 104 persons who have requested private ICF-MR placement and continue to wait for an opening, most have waited more than 45 days. DHS considers many of these to be "priority 3," indicating that DHS believes other applicants (priorities 1 and 2) have more urgent claims to any new ICF-MR openings. But except for vague testimony from Carolyn Romer's father, Plaintiffs introduced no evidence concerning the individual experiences of persons who requested new level-of-care determinations, whether formally or informally.

*937 3. Analysis

These facts do not imply that Plaintiffs have not received, upon proper request, timely redeterminations of their levels-of-care. Although many Plaintiffs still await private ICF-MR placement, it is clear that they have received initial level-of-care determinations, because they now receive some level of Medicaid services. With respect to those who have made additional requests for private ICF-MR placement, the Court does not know how their requests were handled, whether they were informed about the status of their applications, or whether their requests were passed on to private ICF-MR providers. Several DHS forms introduced in evidence  CP-31 (Plaintiffs' Exhibit 15), AP-167M (Plaintiffs' Exhibit 16), AP-166M (Plaintiffs' Exhibit 17), and the "Notice of Denial of a Prior Authorization Request for Medical Services" (Plaintiffs' Exhibit 18)  suggest that Defendants have formal mechanisms for informing unsuccessful applicants for ICF-MR placement about the results of their requests. See also DHS Manual § 360, p. 6; id. § 376, p. 4. The Court has no evidence either that these forms were used or that they were not used.
It is not enough to know that Plaintiffs are still waiting. The Court must also have proof that Plaintiffs have not received new level-of-care determinations. Otherwise, the only inference to be drawn from the evidence is that Plaintiffs have indeed received new level-of-care determinations, but that these redeterminations simply concluded not to alter the status quo.
As with the other claims, Plaintiffs should have tried to prove this allegation one applicant at a time. Instead, they held fast to their statistics and generalities. They omitted necessary evidence about individuals who requested new placements but never received responses. This may have actually occurred, but Plaintiffs never demonstrated it. Accordingly, Defendants are entitled to judgment in their favor on this claim.

CLAIM VIII: HEARING AND NOTICE OF DENIAL

1. Legal Background

The Medicaid Act requires the State Plan to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3) (1988). Corresponding regulations add that the State agency must inform every applicant and recipient in writing of his right to a hearing, of the method for obtaining a hearing, and that he may appoint someone else, including an attorney, to represent him. 42 C.F.R. § 431.206 (1991); see generally King, 776 F.Supp. at 658.
As explained in connection with claim VII, the State must also make a prompt redetermination of a current recipient's eligibility when the recipient formally brings to the State's attention a change in circumstances that could make the recipient eligible for a different level of care. When this duty to redetermine eligibility is triggered, the State must provide the corresponding procedural protections, including, if appropriate, notice of denial and of the right to administrative review. King, 776 F.Supp. at 658-59. The State must make its decision within 45 days and grant an opportunity for a fair hearing if the re-evaluation does not result in the requested new level-of-care determination. See 42 U.S.C. § 1396a(a)(3) (1988); 42 C.F.R. § 435.911(a)(2) (1991); King, 776 F.Supp. at 657-59.

2. Analysis and Findings of Fact

Defendants have satisfied the Court that all Plaintiffs are receiving Medicaid services, either through the ICF-MR, waiver, or rehabilitation program. The Court also notes that the CP-31 form used to notify applicants that they are eligible for waiver services also notifies them of the opportunity for administrative review. The Court is satisfied that Defendants are violating no federal requirements in connection with Plaintiffs' entry into the Medicaid system, when they are initially determined to be "ICF-MR eligible."
*938 The evidence conflicts on whether applicants are actually informed of the basis for and the right to appeal adverse decisions regarding their applications for new level-of-care determinations. On one hand, Defendants clearly have procedures in place for such notification. The DHS Manual instructs employees that each application for Medical Assistance must result in a prompt determination of eligibility, and that the applicant must receive timely notice of the result, particularly of an adverse decision. DHS Manual § 360, pp. 6-8. DHS's form letter for notifying applicants that they have been denied prior authorization for medical services (Plaintiffs' Exhibit 18) contains adequate information about appeal rights. The same language giving notice of appeal rights  in three languages  is part of the form letters notifying applicants either that they will receive only waiver services (DHS form CP-31), that they have been denied Medicaid assistance (DHS form AP-167M), or that their Medicaid services will end in ten days (DHS form AP-166M). Still, the Court has no evidence that DHS actually sent these particular form letters to Plaintiffs.
On the other hand, Plaintiffs gave evidence suggesting that some Plaintiffs have never received a notice of denial or of the right to appeal. Carolyn Romer's father could not recall ever receiving this information. Anthony Barile, former acting Director of DHS, testified that DHS has no formal mechanism for monitoring the response time of MHRH. David Nimmo testified that when social workers use DHS's internal form 109 to recommend no placement for an individual, thus relegating the patient to "priority 3," the person normally receives no formal notice of denial or hearing rights. Instead, these decisions are usually communicated "face to face" to the applicant or his family. Priority 3 applicants are generally told that they will remain in consideration for future placements.
Thus, Defendants essentially admit that some priority 3 patients who request ICF-MR placement never receive written statements that their requests have been denied or held over for future consideration. Defendants also admit that these priority 3 applicants do not receive written statements of their right to a further hearing. It is clear that at least some priority 3 applicants are kept in administrative limbo, unsure of where they stand and what they should do next.
The Medicaid Act does not allow this. Medicaid recipients who properly request a new level-of-care determination must receive a written notice of their decision within 45 days of application. If the decision is a denial, then it must contain information about the right to administrative review.
At the moment, the Court does not have sufficient information to frame a remedy for this shortcoming in the State's program. Therefore, the Court will require that the parties submit a plan to rectify this deficiency within 30 days of the date of this Opinion. If the parties cannot agree, each side can submit its own plan and the Court will conduct a hearing to determine which plan should be adopted and incorporated into the judgment.

SECTION 1983
Plaintiffs presented no evidence that Defendants now intend or once intended to deprive them of their rights. A mere lack of due care by a state official does not create liability under 42 U.S.C. § 1983. Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1986). To the extent that Plaintiffs proved any violation of the Medicaid Act, Plaintiffs came nowhere near proving more than a lack of due care. Accordingly, Defendants are entitled to judgment in their favor on this claim.

III. CONCLUSION AND ORDER
Accordingly, Defendants will be entitled to judgment on claim I, II, III, IV, V, VI, VII, and the section 1983 civil rights claim. Plaintiffs will be entitled to judgment on claim VIII. Judgment will not enter until the Court has determined the content of the judgment on claim VIII.
It is so ordered.
NOTES
[1] Dr. Joseph H. Ladd Center, Southwick Group Home, Ridge Road Group Home, and Rogler Farm Road Group Home.
[2] The Court now relies on the legal framework and undisputed factual background set forth in that earlier opinion. Since the legal positions that follow are developed and justified more fully in that earlier opinion, the Court, in the interest of brevity, will omit any discussions here that is already set forth there.
[3] For the exact references to the paragraphs in the complaint that raise these allegations, see King, 776 F.Supp. at 650, notes 1-12.
[4] The terms "categorically needy" and "medically needy" are explained in the earlier opinion, King, 776 F.Supp. at 651.
[5] Between pages 11 and 14 of Exhibit 1, at least five pages were apparently omitted.
[6] David Nimmo testified that, since January 1992, approximately 12 to 15 persons have requested ICF-MR placement, and "some" have been placed.
[7] For example, expert testimony on the medical necessity and appropriateness of a particular ICF-MR opening for a particular Plaintiff would have been helpful.
[8] The waiver program is exempted from the comparability requirements of 42 C.F.R. § 440.240(b). See 42 C.F.R. § 440.250(k) (1991).