PRADO, Circuit Judge,
concurring in part and dissenting in part:
Although my colleagues granted rehearing and now hold that the statute of limitations applicable to the plaintiffs’ claims here begins to run when the individual plaintiff was denied a service, program, or activity,[1] the majority has performed an about-face, and now also holds that sidewalks, curbs, and parking lots[2] are not services under the ADA. While I agree that we must remand this case, I cannot agree with the majority’s novel approach to coverage under the ADA, and once again I must dissent.[3] I believe that characterizing sidewalks as “facilities,” and thereby limiting private causes of action under the ADA, is not supported by the statute, regulations, or caselaw. I fear that the majority departs dramatically from congressional intent and creates a distinction that is unworkable and ultimately meaningless.
I.
The majority asks whether sidewalks “are services themselves.” Maj. Op. at 485. This is not the correct inquiry. The question is not whether the physical structures that compose the sidewalks are a service; rather, it is whether a city provides a service through the construction, maintenance, or alteration of those sidewalks. The answer, of course, is yes. See Barden v. City of Sacramento, 292 F.3d 1073, 1074, 1076 (9th Cir.2002) (“We must decide whether public sidewalks ... are a service, program, or activity ... within the meaning of [the ADA]. We hold that they are .... [because] maintaining public sidewalks is a normal function of a city.... ”). A public entity that constructs a sidewalk *491 performs a public service. Asking whether sidewalks themselves are a service engages in the type of “hair-splitting” cautioned against by our sister circuits. See Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 44-45 (2d Cir.1997) (holding that the zoning decisions of a public entity are covered by the ADA “because making such decisions is a normal function of a government entity”). The majority’s approach does not comport with the plain, unambiguous text of the ADA; thus we need not look to the regulations or congressional intent. Even if we do, however, the majority’s approach is not supported by the promulgated regulations and does not satisfy the intent of Congress.
A.
Title II provides that “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” 42 U.S.C. § 12132. In our original opinion, we reasoned:
Among the definitions for “service” is “a facility supplying some public demand.” Merriam-Webster’s Collegiate Dictionary 1137 (11th ed.2003). When, for instance, a public entity provides a sidewalk, or its accompanying curbs, or public parking lots, it provides “a facility supplying some public demand.” Because providing curbs, sidewalks, and parking lots is a service within the ordinary, “everyday meaning” of that word, we hold that those facilities also constitute a “service” within the meaning of Title II.
Frame v. City of Arlington, 575 F.3d 432, 437 (5th Cir.2009). I continue to agree with this reasoning. The majority’s new opinion, however, adopts a new definition to arrive at a very different result:
The definitions for “service” include “[t]he duties, work, or business performed or discharged by a public official,” and “the provision, organization, or apparatus for ... meeting a general demand.” Merriam-Webster’s Third New International Dictionary 2075 (1993). When, for instance, a public entity provides or maintains a sidewalk, or its accompanying curbs, or public parking lots, it arguably creates an “apparatus for ... meeting a general demand,” but it does not perform “work ... by a public official.”
Maj. Op. at 486. I do not think that two definitions from dueling Merriam-Webster’s dictionaries justify changing our approach to this case. Indeed, either definition encompasses a broad reading of services. When a public entity constructs, maintains, or alters a sidewalk, it performs the “work” traditionally undertaken by a municipality, and thereby provides a public service.
In a show of impressive solidarity, our sister circuits have consistently held that coverage under “services, programs, and activities” is unambiguous and should be broadly construed.[4] The majority’s opin *492 ion dismisses the work of our sister circuits in a footnote, disregarding their interpretation of the ADA and asserting that they considered the issue “without thorough analysis.” Maj. Op. at 485 n.10. On the contrary, I believe that the Ninth Circuit, in Barden, thoroughly considered the text of the statute, regulations, and legislative history of the ADA provisions at issue here.
The Ninth Circuit answered the same question presented in this case,[5] and held that “maintaining public sidewalks is a normal function of a city and without a doubt something that the [city] does. Maintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II.” Id. at 1076 (emphasis added) (citation and internal quotations omitted). Contrary to the approach taken by the majority opinion, the Ninth Circuit focused its inquiry “not ... on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is ‘a normal function of a governmental entity.’ ” Id. (quoting Bay Area Addiction Research & Treatment, Inc. v. City of Antioch, 179 F.3d 725, 731 (9th Cir.1999)). We relied on Barden in the previous opinion, see Frame, 575 F.3d at 436-37, and I am convinced that this reliance was well-placed.
The majority states that it “cannot conclude that the statutory language unambiguously excludes cities’ and states’ physical infrastructure as distinct from the panoply of less tangible benefits cities and state offer to their residents.” Maj. Op. at 13. However, I interpret the language of the statute as providing broad coverage, encompassing both the intangible services offered by public entities and the act of offering tangible goods. A statute is not ambiguous simply because it offers expansive coverage.
B.
The statute is unambiguous. Thus, we need not turn to the Department of Justice’s regulations. Assuming that we should, however, a plain-reading of the regulations demonstrates that providing sidewalks is a public service. In the preamble to its regulations, the Department of Justice explains:
The scope of title II’s coverage of public entities is comparable to the coverage of Federal Executive agencies under the 1978 amendment to section 504, which extended section 504’s application to all programs and activities “conducted by” Federal Executive agencies, in that title II applies to anything a public entity does.
28 C.F.R. pt. 35, app. A at 456 (1996) (emphasis added).
The majority’s opinion looks to Subpart D of the regulations to define “facilities.” Maj. Op. at 486 (citing 28 C.F.R. *493 § 35.1149-59). The opinion then reasons that because physical structures such as sidewalks are defined as facilities and “clustered with items that clearly do not qualify as ‘services, programs, or activities,’ ” they cannot be considered services. Maj. Op. at 487. The majority concludes that because only the regulations which apply to services are actionable, a private cause of action exists only for the sidewalks which facilitate a service.
Although the regulations may set apart facilities from services, nothing in the regulations suggests that when a public entity provides those facilities, it does not provide a service. Indeed, when a municipality constructs a new facility, or alters an existing one, it must comply with the ADA. See 28 C.F.R. § 35.151(a) & (b). Curb ramps and sidewalks are specifically mentioned in 28 C.F.R. § 35.151(e)(2), which requires that “[n]ewly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways.” When a public entity is charged with providing new or altered facilities in compliance with the ADA, the regulations do not require that those facilities relate to a covered service. Similarly, there is no limitation that a sidewalk must take the traveler to a “service.”[6]
Again, I think that the majority opinion’s approach asks the wrong question. It is not the sidewalks themselves that we should concern ourselves with; it is the construction, modification, or alteration of sidewalks that is the “service.” The failure of the public entity to construct, alter, or maintain sidewalks in compliance with the ADA is actionable within the scope of the regulations.
C.
Although I do not believe it is necessary to look to the legislative history, Congressional adoption materials support a broad reading of the ADA. In the accompanying House Report, Congress stated that Title II “simply extends the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act] to all actions of state and local governments.” H.R.Rep. No. 101-485(II), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367 (emphasis added); see also id. at 151, reprinted in 1990 U.S.C.C.A.N. 303, 434 (“Title II ... makes all activities of State and local governments subject to the types of prohibitions against discrimination ... included in section 504 ....”) (emphasis added). When a public entity acts, its actions necessarily fall within the coverage of the ADA and section 504 of the Rehabilitation Act.
“[T]he elimination of architectural barriers was one of the central aims of the Rehabilitation Act.” Alexander v. Choate, 469 U.S. 287, 297, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (citing S.Rep. No. 93-318, p.4 (1973), U.S.Code Cong. & Admin. News 1973, pp. 2076, 2080). And, as this Circuit has elaborated, the purpose of the ADA and section 504 “is the elimination of discrimination against individuals with disabilities ... [by] [mandating physical accessibility and the removal and ameliora *494 tion of architectural barriers.” Pace v. Bogalusa City Sch. Bd., 403 F.3d 272, 291 (5th Cir.2005) (en banc). It would be contrary to the purpose of the ADA for a public entity to erect non-compliant sidewalks.
There exists further indication that Congress did not intend for courts to draw the type of distinction offered in the majority’s opinion.[7] Congress was particularly clear on the subject of curb cuts — a portion of the plaintiffs’ claims here — stating that: “[t]he employment, transportation, and public accommodation sections of this Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets.” H. Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 367. Therefore, “under this title, local and state governments are required to provide curb cuts on public streets.” Id.
Nowhere in the legislative history do the architects of the ADA suggest that the ADA does not cover a public entity’s actions with regard to its sidewalks. If anything, the clear indications that Congress intended the ADA to encourage (and sometimes mandate) the evenhanded offering of public services, should caution against the majority’s opinion’s distinctions.
II.
In addition to the statutory analysis performed in Part I, I am concerned by the broader implications of the majority’s approach; namely, there is no precedent to support the majority’s distinction and the new standard is unworkable.
A.
The majority’s opinion offers no caselaw to support its new analysis. Considering the potential implications of the majority’s novel approach, and given the clear intent of Congress described above, this dearth of precedent is troubling.[8]
Additionally, I am unable to locate a single circuit court case that could support the majority’s opinion even by analogy or extrapolation. Kinney v. Yerusalim, from the Third Circuit, provides some analogous support for a distinction between the treatment of existing facilities and new constructions and alterations. See 9 F.3d 1067, 1072 (3d Cir.1993) (finding that street resurfacing is an “alteration” under 28 C.F.R. § 35.151(b), and thereby requiring curb cuts under 28 C.F.R. § 35.151(e)). *495 Although the regulations place different burdens on municipalities with regard to existing facilities and new or altered facilities, compare 28 U.S.C. § 35.150(a) & (b), with id. § 35.151(b), even Kinney supports a broad reading of covered services and cannot be extended to assist the majority’s approach.[9]
The majority’s opinion creates a split with the Ninth Circuit and is unsupported by any of our sister circuits. While the absence of caselaw on point or analogous treatment is not dispositive, the Barden opinion and the great weight of caselaw supporting a broad reading of the ADA, supra note 4, forces me to doubt the validity of the majority’s new analysis.
B.
The majority’s opinion draws a distinction between tangible facilities and intangible services. This distinction will not work when applied to the numerous mixed tangible/intangible services rendered by public entities. Take, for example, a public park. The park has intangible aspects: entertainment, respite, and fresh air. But it also has tangible aspects: the pathways, drinking fountains, and green spaces. Can we separate the tangible aspects from the intangible? Or are the tangible aspects of a park so interwoven with the intangible that any attempt at separation is futile? When applied to this park hypothetical, I think that the merits of our original treatment of the scope of services are readily apparent. When a public entity decides to build a park (or later alter it), it must do so in a way that provides equal opportunities for access to disabled people.
The majority goes to some lengths to claim that “there should be no proximity limitation of the sidewalk to the benefit.” Maj. Op. at 484 n.9. The majority’s attempt to water-down its own new standard illustrates the difficulty of managing and applying this new standard. In essence, a sidewalk falls outside of the majority’s standard only if it is a sidewalk to nowhere. I question, however, whether any sidewalk goes nowhere.
If the noncompliant sidewalk is immediately outside of a disabled person’s home, that sidewalk will necessarily deny the individual access to any public services. If a disabled individual wants to take a circuitous path to a library and encounters a noncompliant sidewalk, may that disabled person properly bring a claim? Under the “sidewalks to nowhere” standard, must a disabled person use the most direct path to a public service? If a disabled person may avoid a sidewalk lacking a curb cut by taking an easy detour, must she do so? Each of these questions runs counter to the basic ameliorative and equalizing aspects of the ADA. See Pace, 403 F.3d at 291 (“[T]he Congressional objective of both the ADA and § 504 is the elimination of *496 discrimination against individuals with disabilities .... Mandating physical accessibility and the removal and amelioration of architectural barriers is an important purpose of each statute.”).
The district court, on remand, will be placed in the unenviable position of attempting to apply this standard. The district court will be forced to wrestle with a standard lacking any clear limitations or answers to the questions I have posited above. The majority reasons away these fundamental issues with its statement that proximity should not be considered. But if proximity is of no consequence, then what sidewalk could ever fall outside of the reach of the majority’s novel standard?
Arlington built sidewalks. Arlington maintains sidewalks. And, when it deems it appropriate, Arlington alters the sidewalks. Each of these acts is a normal function of government. The acts taken by Arlington with regard to its sidewalks fall within the unambiguous meaning of “services, programs, and activities.” I respectfully dissent.

. For simplicity, I refer to "services, programs, and activities” simply as "services.”

. Similarly, for simplicity, I refer to "sidewalks, curbs, and parking lots” as "sidewalks.”

.Because the majority now recognizes that "[a] plaintiff ... has two years, from the time she knew or should have known that she was denied access to a service, program or activity, to challenge the architectural barriers causing the exclusion,” I concur in Part III of the majority’s opinion. Maj. Op. at 489.

. Barden, 292 F.3d at 1076 ("Rather than determining whether each function of a city can be characterized as a service, program, or activity for purposes of Title II, however, we have construed the ADA’s broad language [as] bringing] within its scope anything a public entity does.’’) (quotations and citations omitted); Johnson v. City of Saline, 151 F.3d 564, 569 (6th Cir.1998) ("[W]e must acknowledge that our conclusion — that the discrimination forbidden by § 12132 must be with regard to services, programs, or activities — is for the most part a distinction without a difference. This is because we find that the phrase 'services, programs, or activities’ encompasses virtually everything that a public entity does.”); Yeskey v. Comm. of Pa. Dep't of Corr., 118 F.3d 168, 171 (3d Cir.1997) (“The *492 statutory definition of '[pjrogram or activity' in Section 504 indicates that the terms were intended to be all-encompassing. They include ‘all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government ... any part of which is extended Federal financial assistance.' ”) (quoting 29 U.S.C. § 794(b)) (emphasis added); Innovative Health Sys., 117 F.3d at 44 (“The ADA does not explicitly define 'services, programs, or activities.’ Section 508 of the Rehabilitation Act, however, defines 'program or activity’ as 'all of the operations' of specific entities ....’”) (quoting 29 U.S.C. § 794(b)(1)(A)), superseded on other grounds, Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 171 n. 7 (2d Cir.2001).

. "We must decide whether public sidewalks in the City of Sacramento are a service, program, or activity of the City within the meaning of Title II of the [ADA] or [the Rehabilitation Act].'' Barden, 292 F.3d at 1074.

. Although it is merely illustrative of the scope of the regulations and not of a private right of action, under 28 C.F.R. § 35.150(d)(2), public entities are required to develop a transition plan for ADA compliance, including a “schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act ... followed by walkways serving other areas.” Sidewalks serving public entities are given priority, but the Department of Justice saw fit to include all manner of destinations within the "other areas” catchall. That the regulation has such broad scope seems to run contrary to the majority’s requirement that a sidewalk must lead to a “service.”

. As explained by one of the ADA's proponents:
Title II covers the range of services, programs and benefits offered by State and local governments, without a requirement that such programs or activities received Federal financial assistance. Thus, title II extends to whatever spheres of authority a State or local government is involved in— including employment, health and service programs, the streets — which require curb-cuts — and the facilities owned or operated by such governments.
136 Cong. Rec. E1913-01, E1916 (daily ed. May 22, 1990) (statement of Rep. Hoyer) (emphasis added). Nothing in the above quote indicates that "the streets” should be treated differently than employment or health and service programs.

. My research reveals only a single federal case that supports the majority’s new analysis. In New Jersey Protection and Advocacy, Inc. v. Township of Riverside, No. 04-5914, 2006 WL 2226332, at *3 (D.N.J. Aug.2, 2006), a district court held that sidewalks were not "in and of themselves, programs, services, or activities for the purpose of the ADA's implementing regulations.” Obviously, an unpublished district court case from another circuit does not control our analysis. Nor does the district court's opinion alter my belief that we should look to the act of providing, maintaining, and altering the sidewalk as the covered service.

. Kinney considered whether the resurfacing of city streets constituted an "alteration” under the regulations. 9 F.3d at 1069. At no point did the Third Circuit draw a distinction between streets and the service of providing them:
If a street is to be altered to make it more usable for the general public, it must also be made more usable for those with ambulatory disabilities. At the time that the City determines that funds will be expended to alter the street, the City is also required to modify the curbs so that they are no longer a barrier to the usability of the streets by the disabled.
Id. A street is also named as a "facility.” See 8 C.F.R. § 35.104. And, obviously, a street is merely a physical structure akin to the sidewalks at issue here. Yet nowhere in Kinney did the Third Circuit imply that the street must lead an individual to a public service or be used by buses for public transport. It is enough that the public entity has decided to alter the street to bring the alteration within the ambit of ADA compliance.