THOMAS, Judge.
In 2008, Brenda Montgomery, the cousin of Betty Jane Kerby, sought services for Kerby under the Alabama Mental Retardation Home and Community Based Waiver program (“waiver services”) from the Alabama Medicaid Agency (“the Agency”). The waiver services are administered by the Alabama Department of Mental Health (“the Department”) and are provided to persons suffering from an intellectual disability.[1] The Department denied Mont *97 gomery’s request for waiver services for Kerby, and Montgomery sought review from the Associate Commissioner for the Division of Mental Retardation Services of the Department, who, at that time, was Patricia Martin. Martin upheld the denial of waiver services.
Montgomery then sought a fair hearing from the Agency, which was held before an administrative law judge (“ALJ”). Although the ALJ determined that Kerby qualified for waiver services and recommended that the denial of waiver services be overturned, the Agency’s Commissioner, Carol Steckel, disagreed and upheld the denial of Montgomery’s request for waiver services for Kerby. Montgomery sought judicial review of Commissioner Steckel’s denial of waiver services, and the circuit court overturned the Commissioner’s decision, concluding that it was not supported by the evidence provided to the Agency and the ALJ and that Commissioner Steckel’s decision to deny waiver services was arbitrary and capricious. The Agency appeals.
Under the Alabama Administrative Procedure Act (“AAPA”), Ala.Code 1975, § 40-22-1 et seq., review of the Agency’s administrative decision to deny waiver services to Kerby is limited. See Ala.Code 1975, § 41-22-20(k).
“Section 41-22-20(k) provides that in the circuit court ‘[t]he agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute.’ Under this limited standard of review, the circuit court must give the Agency’s determination of noneligibility a presumption of correctness. See Benton v. Alabama Board of Medical Examiners, 467 So.2d 234 (Ala.1985).
“In fact, under § 41-22-20(k) the circuit court may reverse or modify an agency’s decision only if it determines that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to the agency (not applicable in this case) or ‘if substantial rights of the petitioner have been prejudiced because the agency action is:
“‘(1) In violation of constitutional or statutory provisions;
“ ‘(2) In excess of the statutory authority of the agency;
“ ‘(3) In violation of any pertinent agency rule;
“ ‘(4) Made upon unlawful procedure;
“ ‘(5) Affected by other error of law;
“ ‘(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
“ ‘(7) Unreasonable, arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.’
“This court has held that § 41-22-20(k) ‘recognizes the general rule that judicial review of administrative decisions is limited in scope to whether the order is supported by substantial evidence, whether the agency’s decision is reasonable and not arbitrary, and whether the agency acted within its power conferred upon it by law and the constitution.’ Ferlisi v. Alabama Medicaid Agency, 481 So.2d 400 (Ala.Civ.App.1985).”
Alabama Medicaid Agency v. Norred, 497 So.2d 176, 176-77 (Ala.Civ.App.1986). In *98 addition, “an agency’s interpretation of its own regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation.” Ferlisi v. Alabama Medicaid Agency, 481 So.2d 400, 403 (Ala.Civ.App.1985).
At issue in this case is the eligibility of Kerby for waiver services to be provided to intellectually disabled persons under the waiver-services program, as described in Ala. Admin. Code (Alabama Medicaid Agency), Rule 560-X-35-.01 et seq. The qualifications for waiver services are found in Ala. Admin. Code (Dep’t of Mental Health), Rule 580-5-30-.02(3)(a). That administrative rule reads:
“(3) State-Operated Developmental Center. Individuals with mental retardation who reside in the State of Alabama, and who meet the criteria for admission to a developmental center, will be admitted for evaluation for services (or as required by a Court Order), or may be admitted for short-term respite services or crisis stabilization services.
“(a) Admission Criteria: Individuals who meet the following specific criteria may be eligible for residence in the developmental center/intermediate Care Facility for Persons with Mental Retardation (ICF/MR) for the provision of identified services and supports:
“1. The individual has significantly sub-average general intellectual functioning (IQ lower than 70 on a standardized intelligence test), existing concurrently with deficits in adaptive behavior that manifested in the developmental period (before the age of 18 years, for mental retardation).
“2. Community-based services, both generic and specialized, can not afford the person adequate and appropriate services for habilitation.
“3. Residence in a state-operated developmental center is the least restrictive environment adequate for the person’s habilitation at the time.
“4. In order for an individual to be admitted to ICF/MR Active Treatment Services the individual must meet the criteria stated in # 1 through 3 above. Additionally, the individual will benefit from specialized or generic training, treatment, health and related services in three or more of the following areas of life activity: Self-care, Receptive and Expressive Language, Learning, Self Direction, Mobility, and Capacity for Independent Living. These services are directed towards:
“(i) the acquisition of behaviors necessary for the individual to function with as much self-determination and independence as capable; and/or
“(ii) the prevention of regression or loss of current optimal functional status.”
Commissioner Steckel determined that, despite the ALJ’s recommendation otherwise, Kerby did not qualify for waiver services under the requirements stated in Rule 580-5-30-.02(3)(a)(l).
The record contains both documentary and testimonial evidence establishing the following facts. Kerby was born prematurely in Arkansas in November 1946. Kerby moved to Alabama with her mother when Kerby was approximately 14 years old (around 1960). According to the testimony of Montgomery and another relative, Carolyn Turner, at the fair hearing before the ALJ, Kerby had never been “normal.” Kerby did not complete high school, she does not have a driver’s license, and she has never lived independently. Kerby’s *99 parents are deceased, and she had been living for the last several years either with relatives, who had assisted her and had provided for her, or in a group home for the intellectually disabled. In 1973, when Kerby was 26 years old, the Morgan Probate Court determined that Kerby was “of unsound mind.” A cousin, Hadley Key, was appointed as Kerby’s guardian.
Medical records indicate that Kerby’s physician, Dr. S. Nixon Gillespie, believes that Kerby suffers from an intellectual disability. In a letter written on Kerby’s behalf, Dr. Gillespie surmises that Kerby “[m]ost likely ... did have a brain injury from the premature birth and probably complications of health care and mother’s prenatal care at the time” and then concludes that “[i]t is obvious that [Kerby] did suffer brain injury from birth, resulting in [an intellectual disability].... ” In a medical note, Dr. Gillespie indicates that Ker-by’s history, including her premature birth and her educational history of failing grades, “indicates absolutely that [Kerby] was [intellectually disabled] and not demented .... ” Other medical notes further indicate that Dr. Gillespie has determined that Kerby suffers from an intellectual disability.
Anecdotal evidence indicating that Ker-by’s alleged intellectual disability existed before Kerby’s 18th birthday was provided by the testimony of Montgomery and Turner. Their testimony revealed that Kerby did not have friends or have social interactions with peers throughout her teenage years. Montgomery noted that Kerby, as far as Montgomery knew, had never given herself medication and could not handle money without supervision. Montgomery said that she had never received a telephone call from Kerby and that she doubted Kerby could remember a telephone number; Montgomery did admit that she did not know if Kerby had ever used a telephone independently or if Kerby could do so. According to Montgomery, Kerby can perform basic hygiene tasks like bathing; however, Montgomery mentioned that Kerby could not cook. Parts of Montgomery’s testimony concerning Kerby’s abilities are difficult to follow because of apparent issues with the audio recording of the fair hearing.
Turner testified that, when Kerby was younger and had visited in Alabama, Ker-by had acted “like a spoiled brat.” Turner also recalled that Kerby had made poor grades while in school; Turner said that when Kerby’s mother had attempted to assist Kerby with homework, Kerby “did not seem to have a clue.” According to Turner, Kerby’s mother picked out Ker-by’s clothes for her. A letter from Turner also appears in the record. In that letter, Turner explained that her memories of Kerby during her teenage years were that Kerby did not develop close friendships or exhibit interest in typical teenage pursuits, like “social activities, career interests, fashionable clothes, make up, hairstyles and boys.” Turner further noted that Kerby’s gait was similar to that of a young child and that her handwriting had not developed beyond that of a five-year-old child.
The evidence in the record regarding Kerby’s schooling indicates that Kerby was provided “special classes” at Austin High School in the 1963-64 and 1964-65 school years, when she was approximately 17 and 18 years old. This school record also indicates that she was administered an IQ test in July 1962 on which she scored 67. Written on the school record beside her classes for the 1963-64 school year is the phrase “High Elementary Level.” The school record reflects that Kerby earned a mix of “A,” “B,” and “C” grades for her classes both in the 1963-64 school year and the 1964-65 school year. Nota *100 tions on the same school record appear to indicate that Kerby scored well below her grade level on achievement tests given in September 1963 and in May 1964. The second page of that school record contains a statement that Kerby “needs help for mental illness!” A second school record that does not contain any features identifying the school but which indicates that it reflects Kerby’s 1961-62 school year shows that Kerby failed most of her classes that year, earning only 5 “D” grades and 1 “C” grade out of the 16 grades received. The notation “2nd year” appears on that record; whether that denotes that Kerby was repeating course work or not is unclear, because the same school record contains a column labeled “Repeat Work” that contains no recorded information.
In 1995, when Kerby was 48 years old, she took another IQ test when she sought placement in the Bill Stewart Center in Moulton. According to a report authored by Joel E. Loftin, who administered the IQ test and evaluated Kerby, Kerby’s full-scale IQ was 70. Loftin also noted in his report that Kerby had “significant weaknesses in adaptive functioning relative to her age peers in the community.” Loftin concluded that Kerby “would be classified as functioning in the Borderline to Mild [intellectual disability] range of intellectual functioning.” Loftin recommended vocational-rehabilitation services for Kerby and noted that “attention should be given to development of independent living skills and work activity skills along with development of better socialization and interpersonal skills.”
LaGretta Ratliff, the Director of Community Services at the Department, testified at the fair hearing before the ALJ. Ratliff testified that she had denied waiver services to Kerby based on the fact that Kerby had scored 70 on an IQ test and was therefore not qualified to receive waiver services. According to Ratliff, had Kerby never scored 70 on an IQ test, Ratliff would have approved Kerby for waiver services. When asked whether the fact that Kerby scored a 62 on an IQ test administered in 2009 would change Ratliffs decision, Ratliff answered in the negative, explaining that the score of 70 indicated that, at some point, Kerby had functioned outside of the intellectual-disability range.
Dr. Susan Ford, the Director of Psychological and Behavioral Services for the Division of Intellectual Disability at the Department, also testified before the ALJ. Dr. Ford’s duties include reviewing appeals from the denial of waiver services. Dr. Ford explained that she had concluded that Kerby was properly denied waiver services. According to Dr. Ford, she had reviewed all the documentation originally provided to the Agency and had reviewed later submissions by Kerby’s counsel to determine whether those submissions might impact the decision to deny Kerby waiver services; Dr. Ford reviewed and assessed Kerby’s eligibility three times during the appeal process.
Dr. Ford said that she based her conclusion, in part, on the fact that Kerby had once scored 70 on an IQ test. Dr. Ford explained that a score on an IQ test may, at times, be lower than a test subject’s true ability because of other factors affecting the test subject at the time of the test; however, she said, an IQ test cannot reflect that a test subject has more ability than the test subject actually has. Dr. Ford admitted that Kerby’s score of 70 on an IQ test may have been affected by services she may have received throughout her life and that the lower score Kerby had received earlier in life might better reflect her true intelligence level; however, Dr. Ford did not agree that the fact that other, lower scores existed qualified *101 Kerby for waiver services. According to Dr. Ford, a person receiving waiver services would be reevaluated and could be disqualified for services if he or she scored 70 on an IQ test. Although she admitted that scores on an IQ test had a +/- 3 standard error of measurement, Dr. Ford stated that she was bound by the Department’s administrative rules to consider Kerby’s score of 70 on the 1995 IQ test to determine her eligibility for waiver services.
Dr. Ford further explained that other information regarding Kerby’s claimed intellectual disability was lacking in the documentation that she had reviewed. According to Dr. Ford, the 1962 IQ test score of 67 noted on Kerby’s school records did meet the requirement of “significantly sub-average general intellectual functioning.” However, Dr. Ford noted, although Kerby had scored a 67 on the IQ test, she had never, as far as the documentation reflected, been diagnosed as intellectually disabled. This, Dr. Ford stated, “was part of the problem” leading to the denial of waiver services. Although the record reflected that Kerby had never been “normal,” that she had poor grades and had been placed in special classes in school, and that she had never lived independently, Dr. Ford testified that the information available was not sufficient for her to determine the actual level of adaptive functioning that Kerby had had before she turned 18 years old. According to Dr. Ford, the information listed deficits in Kerby’s abilities but did not establish the skills that Kerby did have. Without information that could provide a solid basis for determining Kerby’s adaptive-functioning level before age 18, Dr. Ford explained, she was unable to determine whether services that had been provided to Kerby had increased her IQ score over time. Thus, she testified, she had concluded that Ker-by did not qualify for waiver services under Rule 580-5-30-.02(3)(a).
The record contains other documents, including letters to Montgomery conveying and explaining the Department’s denial and memoranda from Dr. Ford to Department and/or Agency personnel outlining her recommendations after her review of documentation relating to Kerby provided to the Department. In a November 2008 letter, Patricia Martin, who was then Associate Commissioner for the Division of Mental Retardation Services of the Department, explained the various reasons why the Department had determined that Kerby was not eligible for waiver services. First, Martin set out the criteria for waiver services: “(1) an IQ score below 70; (2) significant deficits in adaptive functioning skills measured by a standardized tool; AND (3) evidence that both 1 & 2 were present prior to the person’s 18th birthday.” Martin stated that the primary reason for the denial of waiver services to Kerby was the fact that Kerby had scored 70 on an IQ test, which, Martin stated, “eliminates her for consideration for services under the waiver.” Martin also mentioned that the documentation provided to the Department contained a letter requesting an assessment that stated that Kerby “possesses all her self-care skills,” which, according to Martin, “might suggest that [the presence of] significant deficits in multiple areas of adaptive functioning were questionable as well.” Finally, Martin stated, the documentation provided “insufficient evidence ... to verify that [Kerby] would have met criteria for a diagnosis of [intellectual disability] prior to the age of 18 years.” In the conclusion of her letter, Martin further explained:
“Although [Kerby] may have been given a diagnosis of [intellectual disability] early in life, that does not guarantee that she meets the strict eligibility criteria required. Not everyone with [an *102 intellectual disability] qualifies for services under the Waiver in Alabama because there must also be evidence that, except for those services, the person would have to be institutionalized in the near future. The report issued in 1995 indicated that [Kerby] was estimated to be functioning within the Borderline to Mild [intellectual disability] range of intelligence. Persons functioning in the Borderline range of intelligence are not considered to have a diagnosis of [intellectual disability] and those with mild [intellectual disabilities] do not typically require an institutional level of care. Therefore, they would most likely not qualify for [intellectual disability] waiver services.”
After the conclusion of the fair hearing before the ALJ, the ALJ made a recommendation that the Agency overturn the Department’s denial of waiver services to Kerby. In his written recommendation, the ALJ opined that the record evidence “substantiates] [Kerby’s] right to the waiver sought.” The ALJ stated that he relied on the school record indicating that Kerby had scored 67 on an IQ test administered before the age of 18 and on the testimony from Montgomery and Turner regarding Kerby’s lack of adaptive skills in order to reach his conclusion that Kerby met the eligibility requirements for waiver services.
In her letter rejecting the ALJ’s recommendation, Commissioner Steckel noted that Kerby had scored 70 on an IQ test, which, Commissioner Steckel stated, disqualified her for waiver services. Commissioner Steckel also noted that she had found Dr. Ford’s testimony and opinions persuasive on the matter of Kerby’s eligibility for waiver services. Finally, Commissioner Steckel pointed out that Dr. Ford had explained that the waiver-services requirements were more stringent than diagnostic criteria, indicating that, even though a person might be diagnosed with an intellectual disability, that person might not qualify for waiver services if that person were to score 70 or above on an IQ test. Based on her review of the testimony and evidence before the ALJ, Commissioner Steckel upheld the Department’s original decision denying waiver services to Kerby.
As noted above, Montgomery, on Ker-by’s behalf, sought judicial review of the Agency’s denial of waiver services to Ker-by in the Morgan Circuit Court. The circuit court, after considering the administrative record and submissions by both parties, entered a judgment ordering that the Agency provide waiver services to Ker-by. In support of its judgment, the circuit court found fault with the Commissioner Steckel’s reliance on the testimony and opinion of Dr. Ford and her rejection of the ALJ’s findings and credibility determinations. The concluding paragraph of the circuit court’s judgment reads:
“The Court concludes that the Agency Commissioner rejected the findings and recommendations of the Administrative Law Judge in favor of the written opinions of one witness, Dr. Susan Ford. The Commissioner in essence ignored all other evidence, including certain testimony that was elicited from Dr. Ford during the administrative hearing, and overruled the credibility determinations that were made by the Administrative Law Judge. The Court is satisfied that the Commissioner’s rejection of the findings of the Administrative Law Judge was done without substantial justification, that the substantial rights of Ms. Kerby were prejudiced, that the Commissioner adopted legal opinions or conclusions that are not part of the regulations governing eligibility for [waiver] services and that her decision denying *103 eligibility for Ms. Kerby under the [waiver-services] program was not substantially justified and was unreasonable, arbitrary or capricious.”
From that judgment, the Agency appeals.
First, the Agency argues that the circuit court erred when it overruled Commissioner Steckel’s denial of waiver services to Kerby in light of the deference to be afforded the Agency’s determination. The Agency contends that it properly interpreted and applied the criteria for waiver services to Kerby and that, based on a review of all the evidence as examined by the expert employed by the Department, Dr. Ford, Kerby was not eligible for waiver services. Montgomery, on the other hand, argues that the evidence before the ALJ established “unequivocally” that Ker-by was eligible for waiver services and that Commissioner Steckel’s denial of those services was unsupported by the evidence and was arbitrary and capricious.
This court, like the circuit court, is required to begin with the presumption that the Agency decision is just and reasonable. Norred, 497 So.2d at 176-77. Our review of the circuit court’s judgment raises questions regarding the circuit court’s application of this standard of review. The circuit court appears to give more deference to the ALJ’s determination and to fault Commissioner Steckel for reweighing the evidence at the fair hearing to support her decision to deny waiver services to Kerby. However, it is the decision of the Agency, acting through Commissioner Steckel, that is due deference, not the recommendation of the ALJ. “It is the Agency’s commissioner who has the authority to make the final determination for the Agency, and the hearing officer’s recommendations are in no way binding upon the commissioner.” Alabama Medicaid Agency v. Beverly Enters., 521 So.2d 1329, 1333 (Ala.Civ.App.1987). As this court explained in Norred:
“For aught that appears, the circuit court did not apply the AAPA’s limited standard of review in this ease, but, rather, substituted its judgment for that of the Agency as to the weight to be given the evidence presented at the administrative hearing. In this regard, we note that the findings and recommendations of the administrative hearing officer, with which the circuit court concurred, were not binding upon the Agency. Rather, it is the Agency’s commissioner who makes the final determination of Medicaid eligibility based upon the evidence presented at the administrative hearing. Rule 560-X-3-.01(2), Alabama Medicaid Agency Administrative Code.”
Norred, 497 So.2d at 177. By favoring the ALJ’s findings and indicating that the weight given to the evidence by the ALJ was improperly ignored by Commissioner Steckel, the circuit court failed to apply the appropriate standard of review to the Agency’s decision.
However, the circuit court also determined that “the Commissioner adopted legal opinions or conclusions that are not part of the regulations governing eligibility for [waiver] services.” In another portion of its judgment, the circuit court explained that it had concluded that Dr. Ford gave legal opinions that the “[w]aiver eligibility requirement is more stringent than diagnostic criteria” and that “if a person obtains an IQ score of 70 or higher at any point, the person is determined to be ... ineligible for [wjaiver services even if there have been other IQ scores that were below 70.” The circuit court went on to state that, based on its review of the Agency’s brief and the applicable administrative rules, no law supported Dr. Ford’s “legal” opinions. The circuit court explained that it *104 appeared to the court that the diagnostic criteria for intellectual disability and the eligibility criteria for waiver services were “parallel.” In conclusion, the circuit court stated that “Dr. Ford’s opinion that an IQ score of 70 or higher at any point disqualifies a person for [waiver services] may be a professional rule of thumb, but it does not have the force of law.”
The circuit court further determined that the Agency was misinterpreting the first criterion for waiver-services eligibility by failing to focus on the presently existing state of intellectual functioning. The circuit court, using the principle that words in a regulation should be given their plain, ordinary, and commonly understood meaning, see Beverly Enters., 521 So.2d at 1332 (“The language used in an administrative regulation should be given its natural, plain, ordinary, and commonly understood meaning, just as language in a statute.”), concluded that the use of the word “has” in the applicable administrative rule required the Agency to consider only the most recent evidence regarding Kerby’s IQ and not the evidence from 1995 establishing that Kerby had scored 70 on an IQ test. See Rule 580-5-30-.2(3)(a)(l) (stating, in part, that to qualify for waiver services proof must be presented that “[t]he individual has significantly sub-average general intellectual functioning (IQ lower than 70 on a standardized intelligence test)”). Because Kerby had scored 62 on the most recent IQ test administered to her in 2009, the circuit court reasoned, Kerby met the first part of the first criterion for waiver services. Although the circuit court’s attempt to apply the principles of statutory construction to the language of Rule 580-5-30-.2(3)(a)(l), is understandable, we cannot agree that the circuit court was permitted to reject the Agency’s reasonable interpretation of the criteria for waiver services set out in the administrative rule governing eligibility for those services.
Again, it appears that the circuit court misunderstands both the appropriate standard of review and the well settled principle that “an agency’s interpretation of its own regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation.” Ferlisi, 481 So.2d at 403. The interpretation of the Department’s and the Agency’s governing criteria was explained by Martin in her letter to Montgomery regarding the denial of waiver services, in Dr. Ford’s memorandum, and in both Ratliffs testimony and Dr. Ford’s testimony at the fair hearing before the ALJ. The consistent interpretation of the waiver-services criteria advanced by the Department and the Agency is that a person must have “(1) an IQ score below 70; (2) significant deficits in adaptive functioning skills measured by a standardized tool; AND (3) evidence that both 1 & 2 were present prior to the person’s 18th birthday.” Both Ratliff and Dr. Ford explained that a person receiving waiver services would be reevaluated and could be disqualified for services if that person scored 70 or higher on an IQ test.
The Department’s and the Agency’s interpretation of the criteria is supported by the fact that there is no mandated federal criteria for provision of services to the intellectually disabled. Alabama is permitted to decline to offer services for the intellectually disabled. King v. Sullivan, 776 F.Supp. 645, 651 (D.R.I.1991) (citing 42 U.S.C. §§ 1396a(a)(10)(C)(iv) & 1396a(a)(31) (1988)) (“A participating state has the option not to offer ICF-MR [intermediate care for persons with mental retardation] services at all.”). Alabama is also permitted “to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in ‘the best interests of the *105 recipients.’ ” Alexander v. Choate, 469 U.S. 287, 303, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (quoting 42 U.S.C. § 1396a(a)(19)); see also Sullivan, 776 F.Supp. at 651 (“If a state includes ICF-MR [intermediate care for persons with mental retardation] services in its State Plan, as Rhode Island has done, then the state is free to set which level of ICF-MR care it will offer above the minimal requirements of 42 U.S.C. §§ 1396a(a)(10)(C)(iv).”).
No evidence was presented indicating that the Department’s and the Agency’s interpretation of the eligibility criteria was unreasonable or that it contradicted any other interpretation of the same or similar criteria. The Department’s and the Agency’s administrative rules have the force of law, and the reasonable interpretation of those regulations by those officials entrusted with applying them are not mere “professional rule[s] of thumb” and are, in fact, the law. Ex parte Wilbanks Health Care Servs., Inc., 986 So.2d 422, 424 (Ala.2007) (“ ‘Rules, regulations, and general orders of administrative authorities pursuant to powers delegated to them have the force and effect of laws when they are of statewide application....’” (quoting Hand v. State Dep’t of Human Res., 548 So.2d 171, 173 (Ala.Civ.App.1988))). Therefore, the circuit court was not permitted to supplant the Department’s and the Agency’s interpretation of the criteria for waiver services with its own interpretation.
The Agency is the agency to which decisions regarding eligibility for waiver services are ultimately entrusted. See Ala. Code 1975, § 22-6-7 (“The Medicaid Agency of the State of Alabama [is] the single state agency charged with responsibility for administering the Alabama Medicaid Program.... ”). The record contains no evidence indicating that the Department’s and the Agency’s interpretation of Rule 580-5-30-.02(3)(a) is unreasonable, and the circuit court was not free to interpret that rule differently. However, we must still consider whether Commissioner Steckel’s decision to uphold the denial of waiver services to Kerby was without substantial justification, arbitrary, or capricious. We have explained that, even in light of the fact that the findings of the ALJ are not binding on the commissioner, “[i]n making [a] final determination, however, the commissioner’s discretion is not unbridled. She must have some reasonable justification for her determination or base it upon adequate principles or fixed standards so that it will not be arbitrary or capricious.” Beverly Enters., 521 So.2d at 1333.
Based on the evidence of record, Commissioner Steckel’s decision to uphold the denial of waiver services to Kerby is supported by the Department’s and the Agency’s interpretation of Rule 580-5-30-.02(3)(a) and the application of the criteria set out in that rule to Kerby. Therefore, Commissioner Steckel’s decision is not without substantial justification, arbitrary, or capricious. The determinations of Dr. Ford, Ratliff, Martin, and Commissioner Steckel were consistent with the Department’s and the Agency’s interpretation of the criteria set out in the applicable administrative rule. Dr. Ford testified that, based on all the documentation she was provided, she had determined that Kerby had scored 70 on an IQ test, indicating that Kerby had, in fact, that level of intelligence. Dr. Ford also noted that the evidence regarding Kerby’s adaptive-functioning skills before the age of 18 was not developed enough for her to conclude that Kerby suffered from an intellectual disability before she turned 18. Because of these facts, Dr. Ford concluded, Kerby was not entitled to waiver services. Dr. Ford’s *106 detailed explanation of the issues she encountered when assessing Kerb/s eligibility and her testimony that she reviewed information pertaining to Kerby on three occasions indicates that sufficient consideration was given to Kerby’s eligibility. Commissioner Steckel was entitled to rely on Dr. Ford’s analysis of the eligibility criteria and Dr. Ford’s decision regarding whether Kerby met those criteria; the commissioner’s decision to do so is in no way arbitrary or capricious. Accordingly, we reverse the judgment of the circuit court and remand the cause for proceedings consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs specially, with writing, which MOORE, J., joins.

. Although most of the statutes and administrative rules governing the Alabama Department of Mental Health use the terms "mentally retarded” or "mental retardation,” the Department is in the process of changing the terminology in the statutes and the rules to "people with an intellectual disability” or "intellectual disability.” See Ala.Code 1975, § 22-50-2.1(d). Thus, we will use the term "intellectual disability” or appropriate phras *97 es to refer to the condition formerly referred to as "mental retardation.”